**Vicky D. FRANCIES, Appellant–Petitioner,**

v.

**Joan C. FRANCIES, Appellee–Intervenor.**

**No. 49A02–0103–CV–175.**

Court of Appeals of Indiana.

Dec. 11, 2001.

Rehearing Denied Jan. 29, 2002.

Robert E. Saint, Emswiller, Williams, Noland & Clarke, Indianapolis, IN, Attorney for Appellant.

Monty K. Woolsey, Nancy L. Cross, Miroff, Cross & Klineman, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

SULLIVAN, Judge.

Appellant, Vicky Francies (Mother), challenges the trial court's order granting custody of her son, S.F., to Joan Francies, the child's paternal grandmother.[1] Mother presents several issues upon appeal, which we restate as:

(1) whether the trial court abused its discretion by failing to timely hold a final custody hearing following an ex parte custody order;

(2) whether the trial court abused its discretion by imposing conditions upon Mother's regaining of custody of her son;

(3) whether the trial court applied the correct standard of law in determining that Grandmother had rebutted Mother's presumptively superior right to custody of her son;

(4) whether the evidence was sufficient to rebut Mother's presumptively superior right to custody of her son;

(5) whether the trial court abused its discretion by finding Mother in contempt of court for failing to obey court orders to return several of her son's personal items.

We affirm with respect to all issues except at to the contempt determination and remand with instructions.

The facts favoring the trial court's judgment reveal that S.F. was born on December 14, 1984, to Vicky Francies and Harvey Francies, Joan's son. Vicky and Harvey lived with Joan in California until S.F. was six years old. Eventually, Vicky and Harvey moved to Indianapolis. In April 1996, Vicky and Harvey separated, and Vicky became ill and required hospitalization. At this time, Joan visited Indianapolis for three weeks to help care for Vicky and S.F. Later in 1996, Joan moved to Indianapolis. Harvey and Vicky were divorced in September 1996 and custody was granted to Vicky. In 1997, Vicky

---

1. Except in stating the facts and where we directly quote the trial court, the parties are hereinafter referred to as Mother and Grandmother.

began to pay mortgage payments on the family home using funds given to her by Joan, and, in October of that year, Joan purchased the home and made payments directly. Also during 1997, Joan took over direct payment of the utility expenses. After her move to Indianapolis, Joan also became a caregiver to S.F. In the middle of 1997, Joan noticed that Vicky's relationship with S.F. became more estranged, with Vicky frequently criticizing S.F. By 1998, Vicky and S.F. had virtually no interaction except for arguing. Also in 1998, Vicky abdicated many of her parental responsibilities to Joan. Joan became S.F.'s primary caregiver, enrolling him in school, getting him ready for school in the morning, preparing meals, and taking him to doctor appointments.

During this period, Vicky began to spend more time away from home, staying out until late at night—often not returning until the next morning after S.F. had left for school. Joan knew where Vicky was going only half of the time. When Vicky was home, she spent long periods of time in her room using the internet. Sometimes Vicky was on the internet until "four and five o'clock in the morning, three or four nights a week." Transcript at 163. In 1998, Vicky also made several out-of-town trips, some of which lasted several days, without telling Joan where she was going. As a result of Vicky's behavior, her relationship with Joan began to deteriorate. By 1998, Joan was financially supporting the household.

In September 1998, Vicky met Dr. Seamus McMillan on the internet. Dr. McMillan lived near Minneapolis St. Paul, Minnesota. From November 1998 until the new year, Vicky spent much of her time in Minnesota with Dr. McMillan. On January 11, 1999, Dr. McMillan arrived in Indianapolis to help move Vicky and S.F. to Minnesota. Although Joan presented a court order restraining S.F. from being removed from Indiana, Dr. McMillan ignored it upon the reasoning that it was not binding because it had not been served on Vicky. S.F. did not want to leave with his mother, and Vicky summoned the police, who, apparently unaware of the restraining order, informed S.F. that he was required to leave with his mother. On January 14, 1999, Joan filed an emergency petition to require the return of S.F. to Indiana and for temporary custody, which the trial court granted that day. A few days later, S.F. was returned to Indianapolis.

On January 27, 1999, the trial court held an emergency custody hearing. At the conclusion of this hearing, the trial court awarded temporary custody of S.F. to Joan and set the final custody determination for hearing on April 16, 1999. After several continuances, the trial court held hearings upon the issue of final custody on June 29, October 25, November 2 and 3, and December 20, 2000. On January 18, 2001, the trial court entered findings of fact and conclusions of law awarding permanent custody of S.F. to Joan (Grandmother). Vicky (Mother) filed a Notice of Appeal on February 8, 2001.

I

*Emergency Custody Hearing*

 Mother claims several errors in the trial court's determination at the emergency hearing.[2] However, the trial court has since made a final custody determination, rendering Grandmother's custody of S.F. during the interim period a *fait accompli*. Therefore, inasmuch as Mother is attacking the validity of the trial court's

---

2. Specifically, Mother argues that the trial court failed to determine that Grandmother had successfully rebutted the presumption that a child should remain in the custody of a parent, and that there was insufficient evidence to support such a conclusion.

emergency custody determination, we are unable to render effective relief, and the issue is moot. *See Bartholomew County Hosp. v. Ryan,* 440 N.E.2d 754, 757 (Ind. Ct.App.1982) (noting that this court will not reverse a lower court's determination where absolutely no change in the status quo will result), *abrogated on other grounds by In the Matter of Lawrance,* 579 N.E.2d 32 (Ind.1991).

Nevertheless, Mother claims that the trial court abused its discretion by failing to make a final custody determination for over two years after the emergency order granting custody of S.F. to Grandmother. Specifically, Mother claims that the delay between the emergency order and the final custody determination deprived her of due process, requiring reversal of the final custody determination. In support of her proposition, Mother cites *Brown v. Brown,* 463 N.E.2d 310 (Ind.Ct.App.1984), and *Wilcox v. Wilcox,* 635 N.E.2d 1131 (Ind.Ct. App.1994). In *Brown,* the trial court entered an ex parte order granting emergency custody of the children to their mother. The trial court in *Brown* failed to hold any hearing on the matter for over two months after the emergency order was entered. Upon appeal, this court stated that it was unreasonable for the custody hearing to follow the ex parte transfer of custody by two months. 463 N.E.2d at 313. The *Brown* court held that this delay, combined with other procedural irregularities,[3] could well have prejudiced the father's ability to retain custody of his children, thus constituting an abuse of discretion. *Id.* at 314.

Similarly, in *Wilcox,* the trial court granted the father custody via an ex parte custody order. The trial court failed to set any hearing on the matter until the father requested that a hearing date be set. The

trial court then set a hearing date that was fifteen months after the ex parte order was entered, and refused the mother's subsequent efforts to accelerate the hearing date. The mother in *Wilcox* was permitted only limited, supervised visitation with her children. Although recognizing that the reversal in *Brown* was due to the cumulative effect of three procedural errors, the *Wilcox* court held that the delay of fifteen months severely prejudiced the mother's right to a hearing on custody and reversed. 635 N.E.2d at 1137.

▪ The *Wilcox* court noted that an ex parte order is an extreme remedy which is intended to be temporary in nature. *Id.* Although a trial court may enter an ex parte order for the protection of a child's welfare, the court is "required by statute to hold a prompt hearing—with notice and an opportunity to be heard—on the custody issue" in order to protect the relationship between the parent and a child. *Wilcox,* 635 N.E.2d at 1137; Ind.Code § 31–17–2–6 (Burns Code Ed. Repl. 1997).

In the case before us, the very day the emergency order was entered, the trial court set a hearing which was held only thirteen days later. At this hearing, where Mother was represented by counsel, the trial court heard testimony and determined that S.F. should remain in Grandmother's custody. Immediately before the hearing, the trial court also conducted an in-depth *in camera* interview of S.F. Thus, the present case is clearly distinguishable from the situations in *Brown* and *Wilcox,* where there was a considerable delay between the ex parte order and a hearing of any kind. More importantly, part of the delay about which Mother now complains is attributable to her own request for a continuance and request for further hearing. *See Spencer v. Spencer,* 684 N.E.2d

---

**3.** The other procedural irregularities in *Brown* were the father's lack of access to a welfare report and the fact that the final de-

termination of custody did not comply with the statutory requirements. *Id.* at 313–14.

500, 502 (Ind.Ct.App.1997) (mother's request for continuance caused part of the delay in final custody determination, supporting court's holding that mother was not denied due process by delay); *Wilcox*, 635 N.E.2d at 1137 (noting that delay in final custody determination was attributable to the trial court alone).

Nevertheless, Mother claims that, as in *Brown*, the combination of the delay and other procedural irregularities amount to an abuse of the trial court's discretion. In support of her contention, Mother refers us to several instances in which Grandmother hampered Mother's attempts to visit S.F. These instances, however, have little to do with procedural errors by the trial court.[4] In fact, the only reference Mother makes to the actions of the trial court is that the court apparently failed to address one of her petitions for visitation. Moreover, the trial court, in its findings of fact, noted that Mother voluntarily cancelled all six weeks of her summer visitation with S.F. in 1999, and this finding is supported by the evidence. Thus, the present case is distinguishable from the circumstances in *Brown*. Similarly, we are not faced with a situation such as was present in *Wilcox*, where the mother was permitted only limited, supervised visitation with her children during the fifteen month delay between the order granting the father emergency custody and the custody hearing.

 The other "irregularity" to which Mother refers is a claim that the trial court violated Marion County Civil Division Rule 53.5 regarding motions for continuance.[5] According to Mother, the trial court violated this rule when it granted Grandmother's motions for continuance.[6] Mother does not provide us with any citation to those portions of the record where she objected to Grandmother's motions for continuance. However, our review of the record reveals that Mother filed an objection to the continuance motion filed by Grandmother on April 14, 1999, and on April 15 the trial court denied Grandmother's motion. On the same day, Grandmother filed an amended motion for continuance. Although a hearing was conducted on April 16 concerning the continuance, the record does not show that Mother objected to this amended motion, or any subsequent motion, based upon Marion County Civil Rule 53.5.[7] Mother has therefore waived any argument regarding violation of Marion County Civil Rule 53.5. *See Potts v. Williams*, 746 N.E.2d 1000, 1006 n. 3 (Ind.Ct.App.2001) (party may not object based upon one ground at trial and argue a different basis upon appeal). Thus, we decline to hold that Mother was denied due process due to alleged procedural irregularities at the trial court level.

## II

### *Custody Evaluation*

 Mother also claims that the trial court abused its discretion when it ordered a custody evaluation to take place. According to Mother, the trial court's June 8, 1999 order "created practical problems regarding the likelihood of a July 1, 1999 trial date since Dr. Lawlor (the court-

---

4. Indeed, the trial court appeared to be concerned with Grandmother's behavior and even threatened her with contempt.

5. The Rule requires motions for continuance to be filed not less than seven days before the trial date, unless good cause is shown by affidavit.

6. Mother does not provide us with any further explanation as to how the trial court violated Marion County Civil Division Rule 53.5.

7. On April 16, 1999, Grandmother's amended motion for continuance was granted and the hearing was continued until July 1, 1999.

appointed evaluator) was required to complete the evaluation between June 8 and 21 with a report to the court by June 21, 1999 ten (10) days before trial."[8] Appellant's Brief at 29. Mother also claims that the order made her participation in the custody evaluation a condition to regaining custody of her son without a prior determination that the presumption in favor of parental custody had been successfully rebutted. Again, however, Mother does not refer us to, nor does our search of the record indicate, where she objected to the trial court's order. In fact, when the trial court indicated that it wanted a full custody evaluation to occur, Mother's concern was that the evaluation be done by someone other than Dr. John Ehrmann, who had been hired by Grandmother. When the trial court suggested that Dr. Richard Lawlor conduct the custody evaluation, Mother's trial counsel stated, "if you don't object to Dr. Lawlor, I don't object to Dr. Lawlor." Transcript at 40. Although Mother did indicate through counsel that she was concerned about the costs associated with the evaluation, she did not object to the evaluation itself. Failure to object at trial results in waiver of the issue upon appeal, and a party may not object based upon one ground at trial and argue a different basis upon appeal. *See Joe v. Lebow,* 670 N.E.2d 9, 21 n. 11 (Ind.Ct.App. 1996); *Potts,* 746 N.E.2d at 1006 n. 3. Thus, Mother has waived appellate review of this issue.

### III

### *Application of the Law*

### A. *Parent–Third Party Custody Disputes*

With regard to parent/non-parent custody disputes, both Mother and Grandmother agree that there is a presumption that a parent, rather than a non-parent should have custody of his or her child. *See Harris v. Smith,* 752 N.E.2d 1283, 1287 (Ind.Ct.App.2001), *reh'g denied.* The non-parent seeking to displace the parent as the custodian bears the burden of overcoming this presumption with clear and persuasive evidence. *Id.* at 1289. Indiana courts have traditionally analyzed such disputes using the test set forth in *Hendrickson v. Binkley,* 161 Ind.App. 388, 316 N.E.2d 376 (1974), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975). Under the *Hendrickson* analysis, the third party seeking custody is required to show that there is parental unfitness, long acquiescence in the child living with the third party, or voluntary relinquishment of custody of the child to a third party "such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child." 161 Ind.App. at 393–94, 316 N.E.2d at 380.

Different panels of this court, however, have declined to follow the *Hendrickson* approach in a strict, mechanical sense. *See, e.g., Turpen v. Turpen,* 537 N.E.2d 537 (Ind.Ct.App.1989); *In re Paternity of L.K.T.,* 665 N.E.2d 910 (Ind.Ct.App.1996). In *Turpen,* a panel of this court reviewed a trial court's determination that a third party should have custody of a child. With reference to the standard of appellate review, the *Turpen* court appeared to reject the "mechanical" approach of *Hendrickson,* stating, "If there is any evidence, or legitimate inferences therefrom to support the judgment of the trial court, this court

---

**8.** We note that, although the trial court's order requiring the custody evaluation was not entered until June 8, the trial court instructed the parties at the April 16, 1999 hearing that it would be requiring such an evaluation.

may not intercede or interfere and exercise or use its judgment as a substitute for that of the trial court." *Turpen,* 537 N.E.2d at 539.[9] Furthermore in *L.K.T.,* the court quoted *Turpen* with approval in that: "preeminent in the court's consideration is the best interests of the child, and ... there might be reasons for preferring a nonparent over a parent which may not fit neatly into one of the three aforementioned [*Hendrickson*] categories." *L.K.T.,* 665 N.E.2d at 912.

Apparently in reference to these cases, the trial court here determined that it was in S.F.'s "preeminent" best interest to be in Grandmother's custody. Appellant's App. at 24. Mother claims that it was improper for the trial court to rely upon *Turpen* and its progeny, citing *Froelich v. Clark (In Re Guardianship of L.L.),* 745 N.E.2d 222 (Ind.Ct.App.2001), *trans. denied.* Mother interprets *Froelich* as rejecting *Turpen* and requiring a showing of one of the three *Hendrickson* factors. However, although the *Froelich* court may have clarified or even limited *Turpen,* it did not embrace a mechanical application of the *Hendrickson* factors. The *Froelich* court held that the evidence sufficient to rebut the parental presumption may include *Hendrickson* factors such as unfitness or abandonment, but was not limited to such. 745 N.E.2d at 230. The *Froelich* court acknowledged that a general finding that it would be in the child's best interest to be placed in the custody of a third party is insufficient to rebut the presumption in favor of parents. *Id.* at 231. Nonetheless, the *Froelich* court held:

"if a decision to leave or place custody of a child in a third party, rather than a parent, is to be based solely upon the child's 'best interests,' as opposed to a finding of parental unfitness, abandonment, or other wrongdoing, such interests should be specifically delineated, as well as be compelling and in the 'real and permanent' interests of the child." *Id.* (quoting *Turpen,* 537 N.E.2d at 538);

accord *Harris,* 752 N.E.2d at 1289–90. Therefore, based upon the evidence of record, we hold that the trial court did not err in concluding that it was in S.F.'s "preeminent" best interest to remain with Grandmother.

Moreover, the trial court did not rely solely upon S.F.'s "preeminent best interests" in determining that Grandmother had successfully rebutted the presumption in favor of Mother. Indeed, the trial court's finding of fact number seventeen stated, "Joan has rebutted the presumption that the child's parent should have custody. *In addition,* it is in [S.F.]'s preeminent best interest that sole custody of [S.F.] be granted to Joan." Appellant's App. at 24 (emphasis supplied). The trial court had already determined in finding of fact number six that Mother had "voluntarily relinquished custody of [S.F.] to Joan, such that the affections of [S.F.] and Joan have become so interwoven that to sever them would seriously mar and endanger the future happiness of [S.F.]" Appellant's App. at 20. Once the presumption favoring parents has been rebutted, the trial court should then engage in a general best interest analysis, wherein it may, but is not required to, consider statutory best interest factors,[10] if the proceeding is not specifically governed by such statutes. *Froelich,* 745 N.E.2d at 231. Therefore, although perhaps not tracking

---

**9.** It may be noted that the author of the *Turpen* opinion fully concurred in the unanimous opinion issued in *Hendrickson.*

**10.** *See* Ind.Code §§ 31–14–13–2, 31–14–13–2.5, 31–17–2–8, 31–17–2–8.5 (Burns Code Ed. Supp. 2001).

the language of *Froelich* or *Harris*,[11] we cannot say that the trial court abused its discretion by referring to S.F.'s "preeminent" best interest in determining that Grandmother should have custody of S.F.

### B. De Facto Custody Statutes

In a related claim, Mother argues that the trial court erroneously relied upon the "de facto custodian" statutes[12] as a basis for rebutting the parental presumption. The *Froelich* court held that the de facto custodian statutes were not intended to displace the presumption in favor of parents. 745 N.E.2d at 230. Here, although the trial court did find that Grandmother had become S.F.'s de facto custodian, there is no indication that the trial court failed to apply the parental presumption. Indeed, immediately before finding that Grandmother had become a de facto parent, the trial court reiterated that Grandmother had rebutted the parental presumption. We find no error in this regard.

### C. Notice of Intent to Move Statute

 Mother also claims that the trial court erroneously relied upon her failure to comply with Ind.Code § 31–17–2–23

(Burns Code Ed. Supp. 2001). Under certain situations, this statute requires custodial parents to give notice of their intent to move to the clerk of court and to noncustodial parents.[13] The trial court did reference this statute by noting that Mother failed to provide notice when she moved to Minnesota. Grandmother concedes that this section would not apply to her, as she is not a non-custodial parent. However, Mother was required by Section 23 to give notice of her intent to move to Minnesota to the trial court clerk, and the trial court could properly consider Mother's failure to do so. Even if the trial court had erred in considering Section 23 in its determination,[14] such would be harmless error. As discussed in full below, even without considering this statute, there was sufficient evidence to support the trial court's conclusion that Grandmother successfully rebutted the presumption that Mother should have custody of S.F.

### IV

#### Sufficiency of the Evidence

 Child custody determinations fall within the sound discretion of the trial

---

11. We note that the trial court entered its findings of facts and conclusions of law before the decisions of this court in *Froelich* and *Harris*.

12. *See* Ind.Code §§ 31–9–2–35.5; 31–14–13–2.5; 31–17–2–8.5 (Burns Code Ed. Supp. 2001).

13. Section 23 reads in pertinent part:
"If an individual who has been awarded custody of a child under this chapter intends to move to a residence:
(1) other than a residence specified in the custody order; and
(2) that is outside Indiana or at least one hundred (100) miles from the individual's county of residence;
the individual must file a notice of the intent to move with the clerk of the court that issued the custody order and send a copy of the

notice to a parent who was not awarded custody and who has been granted visitation rights under IC 31–17–4 (or IC 31–1–11.5–24 before its repeal)."

14. In this regard, one could possibly argue that notice to the trial court clerk is only required if there is a non-custodial parent having visitation rights under a decree. The record before us does not disclose whether the 1996 dissolution decree granted visitation to S.F.'s father. The Case Chronological Summary does reflect the dissolution, the award of custody and a child support order against the father. It is silent as to visitation. Neither does the record reflect that after the dissolution there was any continuing relationship between the father and S.F., or that father complied with the support order.

court, and the trial court's determination will not be disturbed upon appeal absent a showing of abuse of that discretion. *Harris*, 752 N.E.2d at 1289. A trial court abuses its discretion only if its decision is against the logic and effect of the facts and circumstances or the reasonable inferences to be drawn therefrom. *Id.* Upon appeal, we consider only that evidence supporting the decision of the trial court. *Id.* We will not reweigh evidence nor reassess witness credibility, nor will we substitute our judgment for that of the trial court. *Id.*

Notwithstanding this standard of review, Mother contends that the evidence does not support the trial court's findings. With regard to Mother's behavior prior to 1999, the trial court found as follows:

"5. That initially when Joan moved in with Vicky and [S.F.], Vicky was the main caregiver. However in mid 1997, Vicky became more focused on her own needs, spending more time away from home in the evenings until late at night and less time spent with [S.F.]. This behavior escalated in 1998, when Vicky began spending extraordinary amounts of time using her computer often until the middle of the night. Joan became [S.F.]'s primary caregiver, as Vicky began to leave [S.F.] with Joan for extended periods, while she traveled to meet men that she had corresponded with via the Internet. In September 1998 Vicky traveled to Colorado for several days, then to Idaho for a week in October. Also during the fall of 1998, a man named Chuck came to Indiana to see Vicky. Vicky had represented that she would marry Chuck. Then her relationship and travel began with Seamus McMillan. Vicky provided phone numbers to [S.F.] but deliberately did not inform Joan of her location, phone number or length of anticipated duration of any of these trips, although expecting Joan to continue as primary caregiver

for [S.F.]. Each time Vicky represented to [S.F.] that they were going to move to the designated state where the current boyfriend resided. Each time she left Joan solely in charge of the care of [S.F.]

6. That Vicky has voluntarily relinquished custody of [S.F.] to Joan, such that the affections of [S.F.] and Joan have become so interwoven that to sever them would seriously mar and endanger the future happiness of [S.F.] [S.F.] views his grandmother as his parent. That the GAL report, the report of the custody evaluator, the testimony and report of Dr. Ehrmann and the in camera interview of [S.F.] by this Court support the finding of strong relationship between Joan and [S.F.]." Appellant's App. at 19–20.

The evidence adequately supports the trial court's findings and conclusions. As recounted in the statement of facts above, there was testimony which supported the trial court's findings that Mother voluntarily relinquished custody of S.F. by her behavior in 1997 and 1998. In addition, the trial court also heard testimony that Grandmother and S.F. had become strongly emotionally attached. Dr. Lawlor, who performed the custody evaluation, testified that Grandmother and S.F. had formed a closely knit bond, and that separating Grandmother and S.F. would have a "definite impact" on S.F. Transcript at 389. Dr. Lawlor's report also acknowledged that S.F. would have a difficult time if he were required to move to Minnesota to be with his mother.

Furthermore, the report of the court appointed guardian ad litem (GAL), filed on April 12, 1999, noted:

"Although Vicky Francies' [sic] efforts [to become independent] should be applauded, her means of obtaining that

goal has unfortunately soured her relationship with her son. [S.F.] appears very angry about not only about the divorce of his parents but more so about the way he feels his mother has ignored him over the last several months. [S.F.] has indicated to the GAL he has been isolated from his mother by her persistence in obtaining personal goals. Joan Francies appears to have been the emotional and financial support for [S.F.] as well as Vicky.... [S.F.] reports he has turned to grandmother to talk to, as he can no longer talk to Vicky. [S.F.] does remember a time when his mother was the person he could go too [sic]; however, since the divorce she has been preoccupied. The GAL has determined the more stable environment for [S.F.] is to remain in the custody of Joan Francies." Appellant's App. at 183–84.

Grandmother also presented the testimony of Dr. Ehrmann, a clinical child and family psychologist who performed a psychological evaluation of Grandmother and evaluated the nature of the relationship between her and S.F. Dr. Ehrmann testified that S.F. respected his grandmother and looked upon her as a parent. Dr. Ehrmann also testified that, "historically [S.F.] described grandmother as always being there and always being available to him and for him[,] and it is my strong belief that there is a wonderful bond between the two of them." Transcript at 466. Dr. Ehrmann further stated that to "sever that relationship [between Grandmother and S.F.] by removal certainly is a significant matter of concern regarding

[S.F.]'s future adjustment." Transcript at 479.

Thus, there was sufficient evidence to support the trial court's findings, which in turn support the trial court's conclusion that Mother had relinquished custody of S.F. to Grandmother, and that the affections of S.F. and Joan have become so interwoven that to sever them would seriously mar and endanger S.F.'s future happiness.[15] This evidence also supports the trial court's determination that being in Grandmother's custody was in S.F.'s best interests. *See Froelich*, 745 N.E.2d at 231 (if the parental presumption is rebutted, the trial court should then engage in a general best interests analysis).

Mother also claims error in the trial court's consideration of her actions subsequent to the January 1999 order granting temporary custody to Grandmother. The trial court, in its findings and conclusions, stated that:

"Vicky's actions since January, 1999, have shown a long acquiescence of the ongoing support, both financial and emotional of [S.F.] by Joan. That Vicky's actions during the summer of 1999 demonstrate Vicky's voluntary relinquishment and/or long acquiescence of custody of [S.F.] as follows: Vicky requested an indefinite continuance of the final hearing in this cause ... stating among other reasons that she had insufficient funds to complete the court ordered evaluation; Vicky voluntarily cancelled all six (6) weeks of her summer, 1999

---

**15.** Upon appeal, Mother makes much of the fact that upon cross-examination, the GAL testified that there was no evidence of Mother voluntarily abandoning S.F. Also, Dr. Lawlor testified that he did not believe that Mother had voluntarily acquiesced in Grandmother's custody of S.F. However, the final determination of these matters was for the trial court to decide, and we may not consider evidence which does not favor the trial court's judgment upon appeal. However, no inference should be drawn that, in and of itself, a short term relinquishment of custody for the sole purpose of the natural parent to rehabilitate himself or herself from illness, trauma or economic crisis will constitute an abandonment or voluntary relinquishment so as to warrant a permanent change of custody order.

visitation with [S.F.]; Vicky failed to pay child support to Joan and thereby failed to reasonably provide for [S.F.]'s support; and although Vicky did not have permanent employment, she had a month-to-month lease on her apartment, and she· had terminated her romantic relationship with Dr. Seamus McMillan, the man she moved to Minneapolis to live with or near, Vicky chose not to return to Indianapolis to reside closer to her son. Further, when Vicky obtained her current job with a salary of $40,000.00 in August 1999, she not only failed to return [S.F.]'s belongings until again court ordered, she paid for her own expenses to take a vacation to Europe in September 1999 with Seamus McMillan. Grandmother was the party that requested on July 9, 1999, that the matter be set for final custody hearing." Appellant's App. at 20–21.

 We are concerned that a third party with custody of a child might cause repeated delays in a custody hearing in order to support a claim that the child and the third party have become so emotionally interwoven that to separate them would seriously mar and endanger the future happiness of the child. This would be improper bootstrapping. However, it appears that the trial court here was primarily concerned with that part of the delay caused by Mother herself. Even if Mother's behavior after the emergency hearing should not have been considered as evidence of "abandonment" or "voluntary relinquishment," the *Froelich* court held that evidence sufficient to rebut the parental presumption was not limited to such factors. 745 N.E.2d at 230. Indeed, Mother's behavior during the time between the emergency hearing and the final custody order might well be considered by the trial court as evidence of "other wrongdoing." *See id.* at 231. Moreover, even if the trial court did improperly consider Mother's post 1999 behavior as evidence of acquiescence or abandonment, Mother's behavior during 1997 and 1998 was sufficient to support the trial court's judgment. In sum, the trial court did not abuse its discretion in determining that Grandmother had successfully rebutted the presumption in favor of Mother and should have custody of S.F.[16]

V

*Contempt*

 Mother claims the trial court abused its discretion in finding her in contempt for failing to return S.F.'s personal belongings to him and ordering her to pay Grandmother for the cost of those items. The determination of whether or not a party is in contempt rests with the trial court, and we will reverse only upon a showing of an abuse of that discretion. *Crowley v. Crowley*, 708 N.E.2d 42, 51 (Ind.Ct.App.1999). The trial court's contempt judgment will be affirmed unless, after reviewing the record, we are left with a firm and definite belief that a mistake has been made. *Williamson v. Creamer*, 722 N.E.2d 863, 865 (Ind.Ct.App.2000). Willful disobedience of any lawfully entered court order of which the offender had notice is indirect contempt. *Meyer v. Wolvos*, 707 N.E.2d 1029, 1031 (Ind.Ct.

16. Near the end of her brief, Mother makes a one-sentence argument that the trial court erroneously failed to grant her motion for judgment on the evidence at the close of Grandmother's case-in-chief and at the close of all the evidence. However, Mother fails to support this claim with any cognizable argument and has therefore waived appellate review of the issue. *See* Ind.Appellate Rule 46(A)(8)(a). Waiver notwithstanding, as we have determined that the trial court's final judgment was supported by sufficient evidence, the trial court did not err in denying Mother's motions. *See* Ind.Trial Rule 50(A).

App.1999), *trans. denied.* The order must be clear and certain such that there is no question regarding what a party may or may not do and no question regarding when the order is being violated. *Gordon v. Gordon,* 733 N.E.2d 468, 472 (Ind.Ct. App.2000). A party may not be held in contempt for failing to comply with an ambiguous or indefinite order. *Rendon v. Rendon,* 692 N.E.2d 889, 896 (Ind.Ct.App. 1998).

Here, during the emergency hearing on January 27, 1999, the trial court ordered Mother to return S.F.'s bed and clothes within seven days. On March 4, 1999, the trial court entered a written order requiring Mother to return to S.F. his bed and clothes, along with other items to be listed by S.F. At the hearing held on April 16, 1999, although ordering S.F.'s bed to remain with Mother, the trial court again ordered Mother to return S.F.'s personal items. On June 8, 1999, the trial court entered a similar written order; this order vacated the previous order requiring Mother to return S.F.'s bed, but obliged her to return his clothing, sporting equipment, photographs, and books, but not his weightlifting equipment. On July 14, 1999, Grandmother filed a motion for rule to show cause alleging that Mother had yet to return any items to S.F. The trial court held a hearing on Grandmother's motion on August 13, 1999. At this hearing, Mother claimed that she had previously attempted to return some of her son's property, but she admitted that she had not yet done so. Mother did have some of S.F's items with her at the hearing and apparently returned them that day. At the conclusion of the hearings, the trial court told Mother:

"It is ridiculous t[h]at you still haven't gotten a box full of clothes over to [S.F.] whether it's by having an intermediary or your other son or somebody to make arrangements to get [S.F.]'s things back.

We are now at the time for school to start again and he still doesn't have his personal belongings.... On a leap of faith I am not going to find you in Contempt of Court on the other issues either [i.e., failure to return S.F.'s property] because to Order you to pay fees at this point ... would be frustrating as all get out." Transcript at 77.

Thereafter, on February 24 and March 13, 2000, the trial court entered orders requiring S.F. to list "any and all belongings not yet returned to him by Vicky Francies when he visits March 17 through March 19." Appellee's App. at 34. At the final custody hearing held on June 29, 2000, Grandmother testified that S.F. had yet to receive all of the items Mother was ordered to return but did state that S.F. had brought back with him some clothing and books from his visits with Mother. Grandmother then entered into evidence a list of items she had purchased to replace those not returned by Mother. The total cost of replacement for the listed items was $5,840.11.

In its final findings of fact, the trial court stated:

"The Court then made an additional order on March 4, 1999, wherein Vicky was to return [S.F.]'s clothing and sports equipment to her child. Mother finally complied with the return of most of [S.F.]'s items following yet another hearing on August 13, 1999. However, Joan had spent funds to replace and provide many items to [S.F.] in the interim.

* * *

That during the pendency of this action, Joan purchased items for [S.F.] in order to replace his personal belongings that Vicky failed to return. Joan is awarded a judgment of and from Vicky Francies

in the amount of Five Thousand Eight Hundred Forty Dollars and $^{11}/_{100}$ ($5,840.11), payable within 120 days, for Vicky's continued failure and refusal to comply with this Court's Order of more than two (2) years ago, requiring her to return to [S.F.] all of his belongings." Appellant's App. at 21–22, 26.

Upon appeal, Mother claims that the trial court erred in finding her in contempt because she had no notice of the trial court's orders. In support of her argument, Mother claims that the chronological case summary (CCS) contains no indication that the trial court ordered Mother to return S.F.'s belongings. However, as detailed above, the record contains several orders requiring Mother to return S.F.'s belongings, and these orders are listed in the CCS. That the CCS does not contain every provision of these orders is of no import. Mother also admitted at the final custody hearing that she was aware of the trial court's orders regarding this matter. Thus, there is no merit to Mother's claims that she had no notice of the trial court's orders.

Mother also claims that Grandmother never petitioned the trial court for a contempt hearing before the June 29, 2000 final custody hearing. However, as noted above, Grandmother filed a motion for rule to show cause on July 14, 1999, alleging that Mother had yet to return any items to S.F. We also disagree with Mother's claims that the trial court's orders were unclear. To the contrary, the orders were quite clear and certain. There was also sufficient evidence to support a finding of willful violation of the trial court's orders. Despite repeated orders to return S.F.'s items, Mother did not return all of S.F.'s belongings. Grandmother testified that, even after the trial court decided not to hold Mother in contempt after the August 13, 1999 hearing, Mother still failed to fully comply with the trial court's orders. Mother also claims that, because the trial court heard the matter on August 13, 1999, the trial court could not hold her in contempt thereafter. However, Mother's actions after that hearing evidenced continued non-compliance with the trial court's orders. The trial court did not abuse its discretion by finding Mother in contempt.

 Nevertheless, we have concerns regarding the amount the trial court ordered Mother to pay. The amount awarded to Grandmother by the trial court was based upon an exhibit listing the items Grandmother purchased as replacements for those items not returned by Mother. This list contains items Grandmother purchased to replace S.F.'s bed and weightlifting equipment—items which were explicitly excluded from the items the trial court ordered to be returned. Mother could not be required to pay for items she was not ordered to return. The combined cost of the weightlifting equipment and bedroom furnishings totaled $2,234.79. Therefore, we reverse with respect to the amount Mother was ordered to pay and remand with instructions to reduce this amount by $2,234.79, for a total of $3,605.32.

### Conclusion

In conclusion, the delay between the emergency custody hearing and the final custody determination did not deprive Mother of due process requiring reversal. Mother has waived any argument regarding the trial court's order requiring a custody evaluation. The trial court used a correct standard of law in determining that Grandmother had successfully rebutted the presumption that Mother should have custody of S.F. The evidence was sufficient to support the trial court's determination that Grandmother should have custody of S.F. Finally, the trial court did not abuse its discretion in finding Mother

in contempt of court; however, we remand to the trial court with instructions to modify the judgment with respect to the amount Mother was ordered to pay.

The judgment is affirmed in part, reversed in part, and remanded with instructions.

MATTINGLY–MAY, J., and BARNES, J., concur.