**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 03 2012, 9:46 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES J. AMMEEN, JR.**
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**JAN BARTEAU BERG**
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MONICA LEIGH FORTNER, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No.  84A01-1204-DR-162 |
| | ) | |
| PAUL LEON FORTNER, III, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable Phillip I. Adler, Judge
Cause No. 84D02-1102-DR-765

**December 3, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

Monica Leigh Fortner ("Mother") appeals the trial court's dissolution order, which awarded joint legal and physical custody of the parties' two and one-half (2½) year old daughter, S.F., to Mother and Paul Leon Fortner, III ("Father").

We affirm.

ISSUE

Whether the trial court abused its discretion by ordering Mother and Father to share joint physical custody of S.F.

FACTS

Mother and Father married in July 2008. At the time of their marriage, both Mother and Father were members of the military; Mother was a medic in an airborne unit of the United States Army, and Father was a member of the Indiana National Guard. Additionally, Father was a member of a local laborer union. After they got married, Mother was stationed at an Army base in Germany. In December 2008, Father, after obtaining a one-year leave from the National Guard, moved to Germany with Mother.

Mother and Father had one child, S.F., who was born in November 2009 while they were in Germany. In January 2010, Father left Germany and returned to Indiana to report for duty with the National Guard. Mother and S.F. remained in Germany, and S.F.'s maternal grandmother, Bonnie Gerth ("Maternal Grandmother"), went to Germany to stay with them.

Mother was ordered to deploy to Afghanistan in May 2010. A few months prior to Mother's deployment, in late March 2010, Mother, S.F., and Maternal Grandmother left

Germany and returned to the United States. Mother and S.F. initially stayed in North Carolina, where Maternal Grandmother lived, and visited Mother's family. After a visit to Indiana, Mother and S.F. returned to North Carolina. Mother then returned to Germany to prepare for her deployment. Thereafter, in late April 2010, S.F. went to live with Father in Indiana during Mother's deployment.

While S.F. lived with Father, her paternal grandmother, Penny Lewis ("Paternal Grandmother"), who lived next door to Father, helped Father care for S.F. During July 2010, when Father was required to attend a two-week National Guard training, S.F. went to stay at Maternal Grandmother's house in North Carolina. Following Father's training, S.F. returned to live with Father in Indiana. In August or September 2010, a friend of Father's who later became his girlfriend, Amanda Sievers ("Girlfriend"), moved in with Paternal Grandmother and babysat for S.F.

In October 2010, upon the end of Mother's deployment, Mother returned to the Army base in Germany. Thereafter, Maternal Grandmother took S.F. to Germany to live with Mother.

In December 2010, Mother obtained leave and returned with S.F. to the United States. After vising family in North Carolina, Mother and S.F. then came to Indiana to reunite with Father. In January 2011, Mother returned to the Army base in Germany, and S.F. remained with Father in Indiana. Sometime thereafter, Girlfriend moved in with Father and became pregnant with Father's child.[1]

---

[1] In September 2011, Girlfriend gave birth to a son, L.F.

3

On February 7, 2011, Father filed a pro se petition for dissolution and served Mother, who was in Germany. Thereafter, counsel for Mother entered an appearance for Mother and filed an emergency motion for a provisional order establishing child custody and child support. The trial court scheduled a hearing on Mother's motion for March 28, 2011.

One week before the scheduled hearing, counsel for Father entered an appearance and requested a continuance of the hearing due to a previously scheduled hearing in a paternity case in another county. On March 21, 2011, following a telephonic conference,[2] the trial court entered an order, granting Father's request for a continuance over Mother's objection. The trial court ordered that S.F. would remain in "temporary" custody of Father and that Mother, who was scheduled to arrive in Indiana the following week on military leave, would have visitation with S.F. in Indiana while on leave. (App. 43). The trial court also ordered that S.F. was not to be removed from Indiana and that Mother would return S.F. to Father's custody upon her return to Germany. Additionally, as part of the order, the trial court informed the parties that it would schedule a preliminary hearing and possibly a final hearing on a date when Mother was back in the United States and instructed the parties to contact the court with an agreed-upon date. Specifically, the trial court's order provided that the trial court "shall place this case on a high priority status and that any date that counsel for the parties agree to the Court w[ould] schedule the same on that agreed date." (App. 43).

---

[2] The March 21st telephonic conference was not recorded; thus, there is no transcript available of that conference.

While Mother was in Germany, Paternal Grandmother, who had an internet connection, helped Father to put S.F. in contact with Mother via Skype. Paternal Grandmother also helped S.F. keep in contact with Maternal Grandmother in North Carolina via Skype.

On April 19, 2011, Mother sent a "To Whom It May Concern" letter to Father's commanding officer in the National Guard, informing him that Father had "committed adultery" and had brought a "discredit upon the Army" and upon their family. (Father's Ex. 14). Around that same time in April 2011, Father requested to be discharged from the National Guard because he "wanted custody of [S.F.]" and did not want to face the possibility of deployments. (Tr. 126). Father's request was granted, and he received an honorable discharge from the National Guard.

On May 3, 2011, Mother filed a motion to inform the trial court that the parties were available on June 17, 2011, for a hearing on Mother's motion requesting a provisional order on child custody and support. The trial court then scheduled the hearing for that date.

During the week prior to the June 17 hearing, Mother filed various motions with the trial court, including the following: (1) Motion for Immediate Entry of Order Permitting Parenting Time Pending Hearing on Motion for Provisional Order; (2) Notice of Intent to Move, informing the trial court that she was going to be stationed at Fort Knox, Kentucky;[3] (3) Notice of Completion of Co-Parenting Class; (4) Notice of Filing Verified Financial Declaration; (5) Motion for Enlargement of Time to Respond to

[3] Mother moved to Ft. Knox in June 2011.

5

Petitioner's First Request for Production and Interrogatories; (6) Petition for Appointment of Special Advocate ("CASA") or Guardian Ad Litem; (7) Subpoena for Attendance of a Witness; and (8) Verified Motion for Medical Examination of Minor Child.

Thereafter, on June 14, 2011, the trial court entered an order, noting that it had received "a niagara of motions" filed by Mother and converting the hearing scheduled for June 17 from a final hearing to a hearing on all pending motions filed by Mother. (App. 116). The trial court ruled that its previous order, which granted Father temporary custody of S.F., was to remain in effect. The trial court ultimately had to cancel the June 17 hearing due to the court "not be[ing] available"[4] but later reset the hearing as a final dissolution hearing for December 13 and 14, 2011. (App. 117).

In the meantime, Mother and Father filed additional motions. On June 22, 2011, Father filed a motion for psychological evaluation of the parties, to which Mother filed a response and agreed to Father's request. On September 9, 2011, Mother filed a praecipe for hearing on all pending motions, including: (1) Mother's motion for a medical examination of S.F.; (2) Mother's request for the appointment of a CASA or guardian ad litem; and (3) Father's motion for a psychological examination. Mother also requested a pre-trial conference to address her contemporaneous request to modify the trial court's temporary custody order.

---

[4] The parties, without citation to the record, indicate that the June 17 hearing was cancelled because the trial judge had a heart attack.

On October 4, 2011, following a pre-trial conference,[5] the trial court entered an order in which it modified its prior temporary custody order. Specifically, the trial court ordered that Mother and Father would share temporary custody of S.F., with each parent having S.F. for "one week continuous at a time" and that the "parties shall enjoy phone privileges with the minor child including 'Skype'." (App. 176). The trial court also ordered Mother and Father, pursuant to an agreement by the parties, to undergo a custody evaluation, and the trial court named Dr. Richard Lawlor to conduct the evaluation.

Thereafter, Mother filed a motion requesting a hearing and status conference to address the following: (1) a request for extended parenting time;[6] (2) issues regarding possession of a truck;[7] and (3) the rescheduling of the December final hearing due to timing issues with the custody evaluation. On November 21, 2011, the trial court held a status hearing and thereafter issued an order in which it rescheduled the final hearing, granted Mother's request for the extended parenting time, and confirmed the parties' agreement to transfer possession of the truck to Mother.

The trial court ultimately held the final dissolution hearing on February 14 and March 15, 2012. Just prior to the dissolution hearing, Mother filed a motion for sanctions against Father and Father's attorney. In her motion, Mother alleged, among other things, that Father and Father's counsel had acted "in bad faith" during the dissolution proceedings and had "committed acts that [were] not in the best interests" of S.F. (App.

---

[5] This conference was not recorded; thus, there is no transcript available of the conference.

[6] Mother sought to have an extra week of parenting time with S.F. in January so that she could take her to a wedding in North Carolina.

[7] Mother sought possession of a pickup truck from Father.

207).  Specifically, Mother accused Father of committing perjury and fraud on the court

and alleged that Father's counsel had suborned perjury and was "complicit in the fraud."

(App. 206).  Mother also asserted that Father and Father's counsel had engaged in "sharp

practice, underhanded tactics, and utter antipathy toward problem-solving or dispute

resolution."  (App. 204).  Additionally, Mother alleged that Father's counsel "appears to

have encouraged [Father] to be intransigent" and argued that "[t]he kind of conduct

exhibited by [Father's] counsel in this case should be sanctioned harshly."  (App. 206).

During the final dissolution hearing, Father's counsel spent a great deal of time

questioning Father at length regarding the allegations contained in Mother's motion for

sanctions against Father and his counsel.

Also during the final hearing, Father and Mother did not dispute that they should

share joint legal custody of S.F.; instead, they disagreed about who should have primary

physical custody.  When asked why he wanted primary physical custody of S.F., Father

testified as follows:

> I mean I'd like to be the physical custodial parent.  I, you know it's, I don't
> know.  I treat her well.  I know she has a good home.  Solid environment.  I
> have all sorts of family around that come and visit with her and cousins,
> you know, all the time.  I – we get along well.  She thrives well at learning.
> She doesn't want for anything, I mean, I make sure she eats like balanced
> foods and takes vitamins for children and eats fruit and I try to get her to
> take vegetables but she eats them reluctantly.  I just think I have a good
> stable environment for her.  I mean, I'm always there.  I no longer have the
> threat of having to be away from home due to the military or any other
> reason for that matter.  She has (witness gets emotional) –
>
> * * * * *
>
> She has a brother now.  I know it's not the best way it came about but I
> think they should be together.

8

Yes. I mean, I love her and I just – I want her around all the time. I mean, she doesn't even like when I leave the room most of the time if we go anywhere. She refers to me as "that's my daddy." She doesn't want anybody getting close to me or anything.

(Tr. 173-74). In the alternative to primary physical custody, Father requested that the trial court continue the provisionally-ordered shared physical custody but asked that the trial court revise it so that the shared custody would occur on two-week intervals.

When Mother was asked why she wanted primary physical custody of S.F., she testified: "For me I think I can just provide more stability, more opportunities, I mean, I think I can better raise her to be productive and that's mainly the reason why I think." (Tr. 340-41). Mother asked the trial court to follow Dr. Lawlor's recommendation regarding physical custody.

Dr. Lawlor did not testify at the hearing, but Father introduced Dr. Lawlor's custody evaluation into evidence. Dr. Lawlor conducted the custody evaluation in December 2011 by interviewing Mother, Father, and Girlfriend and observing S.F.'s interaction with all them and with her step-brother, L.F. In regard to a recommendation regarding custody, Dr. Lawlor's evaluation provided, in relevant part:

Although both parents present as angry about the current situation, and each has done some things to try to gain advantage in the current custody dispute, *my overall impression is that both [Mother] and [Father] are excellent parents. As individuals I think either one of them is capable of parenting [S.F.] as the primary physical custodian.*

* * * * *

One of [Father's] major objections to [Mother] having custody is he does not want [S.F.] raised on a military base or in military housing. On the other hand, military housing as it currently exists would be appropriate, and the Department of Defense schools run for dependents of military personnel

have an excellent reputation. Thus, I think that either parent is able to provide a solid education, as well as appropriate living circumstances for [S.F.]

Much is made of the fact [S.F.] calls [Girlfriend] some version of Mommy on many occasions, and she did that during the course of this evaluation. She also calls [Mother] by the same name. [Girlfriend's] observation is that [S.F.] refers to females like that. This, I think, is an extremely important piece of data in the current evaluation, and my impression is that at her age, [S.F.] is clearly most comfortable with female figures, and looks to female figures, particularly [Mother] and [Girlfriend], as the primary sources of her security and nurturance.

[S.F.'s] attachment to and relationship with her father is good, but it does not compare in terms of closeness and intimacy to what I observed of her relationships with [Mother] or [Girlfriend].

At this point, primarily based on the fact that I think that between the two biological parents, [S.F.] is primarily attached to and with her mother from a psychological perspective, is the major determinant in making a recommendation of custody.

At this point, my suggestion and recommendation would be that [Mother] have joint legal custody with [Father], but that she be denominated the primary physical custodian of [S.F.] at this point.

* * * * *

I think that even though right now [S.F.] seems quite closely attached to both [Mother] and [Girlfriend], custody with [Father] should not be based on the fact that [Girlfriend] has an exceptionally close relationship with [S.F.].

As far as physical parenting time, with [Mother] denominated as the primary physical custodian, I would suggest that [S.F.] be with her in Kentucky three out of four weeks each month, and have one week with [Father] in Indiana each month. I think this would reduce the amount of physical travel that would need to be involved.

(Father's Ex. 15 at 20-22; App. 281-83) (emphasis added).

At the end of the dissolution hearing, the trial court took the matter under advisement. The trial court then addressed Mother's motion for sanctions against Father

10

and Father's counsel, which the trial court stated it found to be "particularly vexing." (Tr. 397). Mother's counsel orally moved to withdraw the motion, but, at the same time, accused Father of lying during the final hearing and suggested that Father's counsel was not cooperative during the dissolution proceeding. Before granting the motion to withdraw, the trial judge expressed his concern that Mother's counsel had accused Father's counsel of the criminal act of suborning perjury. The trial judge also cautioned Mother's counsel regarding the allegations and language used in the motion for sanctions, noting that he found Mother's counsel's motion to be "unprofessional" and "baseless." (Tr. 401).

On March 19, 2012, the trial court entered a dissolution order, which provided in relevant part:

> The most contentious issue to be resolved and the one that took up 95% of the two days of hearings is the determination as to who shall have custody of the parties' two and a half year old daughter, [S.F.] and the parental access to [S.F.]. The hearing, not surprisingly, contained a great deal of he said/she said testimony which often occurs in high conflict custody disputes.

> The Court has in it's [sic] possession a 22-page custody evaluation prepared by Dr. Richard Lawlor which was filed on February 7, 2012. The Court has read the evaluation several times. It is Dr. Lawlor's recommendation that the parties' should share joint legal custody of [S.F.] and that mother be denominated the primary physical custodian. Furthermore, he stated that [S.F.] be in mother's care and custody for three weeks out of every four weeks and father have care and custody of [S.F.] for the one week each month. In the Court's Order of October 4, 2011, the parties alternated care and custody of [S.F.] every other week and since mother is stationed at Ft. Knox, KY the parties were to meet at 3:00 p.m. Indiana time at the Washington, IN courthouse. The testimony reveals that the parenting time as just enumerated has gone along with very few problems with each parent sharing equal time with their two and a half year old daughter. It has been established by testimony that during [S.F.'s] two

11

and a half years, father has had her for a great majority of the time, partially due to mother's military service and her being stationed in Germany. Irregardless [sic] of the reason, father has had the care of [S.F.] for the majority of her life.

One of the most important observations by Dr. Lawlor was that "My overall impression is that both [Mother] and [Father] are excellent parents." The Court shares Dr. Lawlor's impression in this regard. Furthermore, the Court does not find that there is sufficient reason to not equally divide the parties' parental access with [S.F.] on a 50/50 basis which is what has been occurring since October 2011, without major incident. Accordingly, the parties shall alternate care and custody of [S.F.] every two weeks, which will reduce the amount of travel and expense incurred by each party. This two week rotation shall begin on Saturday, March 24, 2012 at 3:00 p.m. at the Washington, IN courthouse. Of course, phone privileges, Skyping and other means of communication between [S.F.] and her parents shall be allowed at reasonable times and frequencies. As it pertains to special days and holidays noted in the Indiana Parenting Time Guidelines, such as Memorial Day, birthdays, Father's Day, Mother's Day, Halloween, Thanksgiving, etc., they shall not apply. This two week alternating parental access schedule shall continue throughout the years, including the summer.

The Court is well aware that once [S.F.] is old enough to begin school that this parenting time schedule will have to be modified. Also, it may need to be modified in the event mother is deployed overseas, mother is transferred to another military base, or mother leaves the military and decides to move away from Ft. Kno[x], KY. Of course, under Dr. Lawlor's recommendation, the same would be true since father was to have parenting time for one week out of every month.

The parties shall share joint legal custody of their daughter.

(App. 3-4). Mother now appeals.[8]

DECISION

Mother does not challenge the trial court's order regarding joint legal custody, but she argues that the trial court abused its discretion by ordering Father and Mother to share joint physical custody of S.F. Specifically, Mother contends that the trial court erred by

---

[8] Mother's appellate attorney is the same attorney who represented her during the dissolution proceeding.

12

ordering joint physical custody because: (a) the trial court "deviat[ed]" from Dr. Lawlor's

recommendation regarding physical custody; and (b) the trial court's order did not

contain a specific finding regarding the best interest of the child.  Mother's Br. at 16. [9]

An initial child custody order is determined "in accordance with the best interests

of the child."  *Baxendale v. Raich*, 878 N.E.2d 1252, 1254 (Ind. 2008) (quoting Ind. Code

---

[9] Before addressing Mother's issue on appeal, we pause to note that "[w]e ask for two basic things from appellate practitioners in this state:  compliance with the Indiana Rules of Appellate Procedure and adherence to fundamental standards of professionalism."  *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 172 (Ind. Ct. App. 2007).  For the reasons discussed below, we feel Mother's counsel has fallen short in both regards.

First, Mother's counsel has not fully complied with the Appellate Rules.  For example, we direct counsel's attention to Indiana Appellate Rule 50(A)(2)(f), which provides that "pleadings and other documents *from the Clerk's Record*" are to be included in the Appellant's Appendix.  (Emphasis added).  However, many of the pleadings contained in Mother's Appendix do not contain a file stamp from the trial court.  Additionally, Mother's counsel has admittedly included documents in the Appendix that are "not part of the official court record[.]"  Mother's Br. at 34, n. 4.

Furthermore, Mother's counsel has reproduced the entire 410-page transcript in Mother's Appendix.  Aside from this reproduction being "a waste of paper and unnecessarily bloating the record on appeal," *see Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 172 (Ind. Ct. App. 2007), it also violates Appellate Rule 50(F), which explicitly instructs that "parties should not reproduce any portion of the Transcript in the Appendix" because the Transcript is transmitted to our Court pursuant to Appellate Rule 12(B).  (Emphasis added).

In regard to the lack of professionalism before our Court, Mother's Brief contains a "public policy" argument in which Mother's counsel accuses Father, Father's counsel, and the trial court of inequitable conduct and asserts that Mother was prejudiced by such conduct.  *See* Mother's Br. at 16; Mother's Reply Br. at 13.  Specifically, Mother's counsel asserts that "the totality of the record below reflects a pattern of inequitable, gaming conduct by Father and his counsel, which the trial court allowed to infect the proceedings and, ultimately, the judgment entered."  Mother's Reply Br. at 13.  Mother's counsel spends more than twenty pages of Mother's Appellate Brief rehashing the facts, some of which are admittedly not contained as part of the record on appeal, and raising accusations similar to those raised in her motion for sanctions against Father and Father's counsel.  Additionally, Mother's counsel accuses the trial court of failing to prioritize the dissolution proceeding and asserts that the trial judge's "emotions might have invaded his discretion and caused him not to decide the case objectively."  Mother's Br. at 49.  Mother acknowledges that her second argument in her brief is just argument and does not raise any separate issue reviewable on appeal, but she contends that "this argument present[s] to the Court of Appeals an opportunity to consider how dispute resolution in family matters proceeds in the trenches."  Mother's Reply Br. at 18.  We acknowledge that dissolution proceedings can be highly emotional, but we caution counsel that inserting those highly charged emotions in an appellate brief does not result in effective appellate advocacy.  *See Steve Silveus Ins., Inc.*, 873 N.E.2d at 173 (noting that "vitriol is inappropriate and not appreciated by this court, nor does it constitute effective appellate advocacy") (quoting *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 162 (Ind. Ct. App. 2006), *trans. denied*).

13

§ 31–17–2–8). When making such a best interest determination, there is no presumption favoring either parent. I.C. § 31-17-2-8. Indeed, "[i]n an initial custody determination, both parents are presumed equally entitled to custody[.]" *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945 (Ind. Ct. App. 2006).

When making an initial custody determination in a dissolution proceeding, the trial court shall consider the following relevant factors:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

    (A) the child's parent or parents;

    (B) the child's sibling; and

    (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

    (A) home;

    (B) school; and

    (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

I.C. § 31–17–2–8. These statutory factors, however, are nonexclusive, and a trial court may consider other relevant factors when making a best interest determination. *See Baxendale*, 878 N.E.2d at 1254. "Although a court is required to consider all relevant factors in making its determination, it is not required to make specific findings." *Russell v. Russell*, 682 N.E.2d 513, 515 (Ind. 1997).

Determinations regarding child custody fall within the trial court's sound discretion. *Francies v. Francies*, 759 N.E.2d 1106, 1115–16 (Ind. Ct. App. 2001), *trans. denied.* We will affirm such a determination unless we find that the trial court abused this discretion. *Id.* Indeed, we have noted that, in child custody disputes:

> . . . the trial court is often called upon to make Solomon-like decisions in complex and sensitive matters. As the trial court is in a position to see the parties, observe their conduct and demeanor, and hear their testimony, its decision receives considerable deference in an appellate court. On review, we cannot reweigh the evidence, adjudge the credibility of the witnesses, or substitute our judgment for that of the trial court. We will not reverse the trial court's custody determination unless it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom.

*Speaker v. Speaker*, 759 N.E.2d 1174, 1179 (Ind. Ct. App. 2001) (citations and internal quotation marks omitted).

When awarding joint physical custody of S.F. to Father and Mother, the trial court entered findings sua sponte. When a trial court enters findings sua sponte, such findings "control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.

15

1997). We will not set aside specific findings unless they are clearly erroneous, and we will affirm a general judgment on any legal theory supported by the evidence. *Id.*

A. Deviation from Custody Evaluation Recommendation

Mother first contends that the trial court abused its discretion by ordering joint physical custody because such custody order deviated from Dr. Lawlor's custody recommendation. Specifically, Mother asserts that the trial court "out-sourced the most significant fact-finding to Dr. Lawlor," Mother's Br. at 16; contends that the custody evaluation was "[t]he single most important evidence" in this case, *id.* at 17; and argues that "[t]here is no logical explanation for how the judge could not have followed the recommendations of Dr. Lawlor." Mother's Reply Br. at 10. We cannot agree.

Here, the trial court was not required to follow Dr. Lawlor's custody recommendation. *See Periquet-Febres v. Febres*, 659 N.E.2d 602, 607 (Ind. Ct. App. 1995) (explaining that a "finder of fact is not required to accept the opinions of an expert simply because he is an expert" and affirming the trial court's rejection of the psychologist's custody recommendation), *trans. denied*; *Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000) (noting that "the fact-finder is not required to accept the opinions of experts regarding custody").

It is clear that the trial court considered Dr. Lawlor's custody recommendation but made its own determination regarding physical custody based on *all* the evidence presented. Mother's arguments regarding the degree of consideration that the trial court should have given to Dr. Lawlor's recommendation amounts to nothing more than a request to reweigh the evidence, which we cannot do. Accordingly, we conclude that the

16

trial court did not abuse its discretion by not adopting Dr. Lawlor's custody recommendation.

B. Best Interest

Mother also argues that the trial court's order awarding joint physical custody was an abuse of discretion because the trial court did not make a finding specifically stating that joint custody was in the best interest of S.F.

While the child custody statute, Indiana Code § C. § 31–17–2–8, requires that the trial court "determine custody . . . in accordance with the best interest of the child[,]" the trial court is not required to make a specific finding regarding the same, especially here, where Mother did not request specific findings of fact under Indiana Trial Rule 52. *See Russell*, 682 N.E.2d at 515 (explaining that "[a]lthough a court is required to consider all relevant factors in making its [custody] determination, it is not required to make specific findings") (discussing predecessor child custody statute, I.C. § 31–1–11.5–21(a)); *Hegerfeld v. Hegerfeld*, 555 N.E.2d 853, 856 (Ind. Ct. App. 1990) (noting that "[t]he [child custody] statute does not require the trial court to make specific findings unless specific findings are requested pursuant to Trial Rule 52(A)") (discussing predecessor child custody statute, I.C. § 31–1–11.5–21(a)).

Furthermore, a review of the transcript from the dissolution hearing reveals that—in addition to hearing evidence presented on the relevant statutory factors—the trial court's focus was on making a custody determination that was in S.F.'s best interest. Indeed, there were times during the hearing where the trial court redirected counsel for

both parties when their questions strayed to events in the past that had no bearing on the issue of custody. For example, the trial judge told the parties:

> Things that happen in the past, that's in the past. Let's get on with living our lives in the future with this child as a common denominator in our lives and how we're going to parent this child, raise [S.F.] to be a productive young, you know, a productive human.

(Tr. 256).

Here, both parties requested primary physical custody and testified to why they wanted such custody. Dr. Lawlor's evaluation report observed that both parents "are excellent parents" and that "either one of them is capable of parenting [S.F.] as the primary physical custodian." Father's Ex. 15 at 20. Additionally, Mother acknowledged that Father was an "excellent" parent. Tr. at 357. The trial court heard testimony from both parties, observing their conduct and demeanor; reviewed all the evidence presented by the parties; and determined that they should continue to share physical custody of their two and one-half year old daughter in a manner similar to what they have been doing under the trial court's provisional custody order. Based on the record before us, we cannot say that the trial court's grant of joint physical custody was an abuse of discretion merely because the order does not specifically state that joint custody was in the best interest of S.F. *See*, *e.g.*, *Hegerfeld*, 555 N.E.2d at 856 (holding that it was "unnecessary" for trial court to make specific findings that custody determination was in children's best interest where parties did not request such findings and affirming trial court's custody determination). *See also Clark*, 725 N.E.2d at 109 (affirming trial court's judgment of shared physical custody).

18

Affirmed.

FRIEDLANDER, J., and BROWN, J., concur