# FOR PUBLICATION



FILED
Dec 18 2014, 10:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRYAN LEE CIYOU**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**DANIEL J. LAYDEN**
**MICHELLE L. FINDLEY**
Williams Barrett & Wilkowski, LLP
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| T.H. and C.H., | ) | |
| | ) | |
| Appellants-Petitioners, | ) | |
| | ) | |
| vs. | ) | No. 41A05-1310-MI-505 |
| | ) | |
| R.J. and K.J., | ) | |
| | ) | |
| Appellees-Respondents. | ) | |

APPEAL FROM THE JOHNSON CIRCUIT COURT
The Honorable K. Mark Loyd, Judge
The Honorable Marla Clark, Magistrate
Cause No. 41C01-1109-MI-77

**December 18, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

## STATEMENT OF THE CASE

This is the second time that C.H. ("Grandmother") and T.H. ("Step-grandfather") (collectively, the "Grandparents") appear before us. Previously, we affirmed the trial court's denial of their Trial Rule 60(B) and Trial Rule 59 motions to set aside the adoption of their granddaughter, B.J., by her stepfather, K.J. ("Stepfather"). *In re Adoption of B.C.H.*, 7 N.E.3d 1000 (Ind. Ct. App. 2014), *trans. granted*.

Now, Grandparents appeal the juvenile court's order granting sole physical and legal custody of B.J. to R.J. ("Mother") and Stepfather (collectively, the "Parents"). The juvenile court had previously adjudicated Grandparents as de facto custodians of B.J., thereby giving them the ability to seek custody. On appeal, Grandparents argue that the evidence did not support the juvenile court's findings of fact and its ultimate conclusions. The Grandparents also claim they were entitled to continued court-ordered visitation with B.J.

Concluding that the evidence supported the juvenile court's factual findings, that the Grandparents failed to rebut the presumption of awarding custody of B.J. to the Parents, and that there was no error in discontinuing court-ordered visitation with Grandparents, we affirm the juvenile court's order.

We affirm.

## ISSUES

1. Whether the juvenile court erred by awarding custody of B.J. to the Parents.

2

2. Whether the juvenile court erred by discontinuing Grandparents' court-ordered visitation with B.J.

FACTS

Mother became pregnant with B.J. at age seventeen while still in high school, working, and residing with her mother and stepfather, the Grandparents. Prior to B.J.'s birth, Grandparents insisted that Mother move into her own apartment. B.J. was born on November 29, 2007. Mother spent two days in the hospital and then went to her apartment, where Grandmother stayed with Mother and B.J. for three days. After five days, Mother and B.J. stayed with Grandparents at their home.

Mother and B.J. eventually returned to her apartment. When Mother returned to work as a server at a restaurant, she frequently dropped B.J. off at Grandparents' home early in the day and returned later in the evenings to pick her up. Mother's work schedule was so unpredictable that B.J. began spending the night at Grandparents' house so that B.J. would have some consistency in her schedule. Mother eventually let B.J. remain with Grandparents to accommodate her work and school schedule and to provide consistency for B.J.

In February 2008, the State, through paternity proceedings, adjudicated T.M. as B.J.'s biological father. The court granted T.M. visitation rights, ordered him to pay child support, and granted sole primary and legal custody of B.J. to Mother. From the time of her birth, B.J. has had no meaningful relationship with T.M. Later in 2008, Mother met Stepfather, an Iraq war veteran, and began dating him.

3

By February 2010, Parents moved into an apartment together and began keeping B.J. at least one night per week. Mother became pregnant about a month later, and Parents eventually married on July 4, 2010. Around this time, Stepfather mentioned to Grandparents that he had an opportunity to train as a drill sergeant in Georgia and that Parents wanted to take B.J. with them. According to Mother, Grandmother told Parents, "you [. . .] and this new baby can go down to Georgia, but you are not taking my baby." (Tr. 694). At the final hearing, Grandmother stated she "didn't put it like that," but did say that she thought it "wouldn't be right" because "[B.J.] had bonded to [Grandparents]" and that their home was the "only home she had ever known." (Tr. 447). Parents did not move, and B.J. continued to split time between Parents and Grandparents. Later in 2010, Parents initiated proceedings for Stepfather to adopt B.J. In January 2011, Mother gave birth to a girl, P.J. For about four weeks after P.J.'s birth, B.J. did not visit with Parents. After Mother recovered from giving birth, B.J.'s visits with Parents resumed.

Tension between Parents and Grandparents eventually boiled over in September of 2011. At that time, Grandmother witnessed Stepfather and B.J. having a pillow fight. Grandmother thought that Stepfather was being too rough with B.J. Mother was present at the time and tried to assure Grandmother that everything was okay. Mother pointed out that no one was hurt and that B.J. was laughing. Grandmother nonetheless insisted that Stepfather was playing too rough with the child and claimed that she was injured.

Grandmother took B.J. to a chiropractor for an examination after the pillow fight. After an examination, the chiropractor diagnosed B.J. with whiplash.[1]

The next day, Stepfather dropped the children off at Grandparents' home so that Parents could go to a doctor's appointment. When the Parents returned, Grandmother told Parents that Stepfather needed to watch how he played with B.J. because of the chiropractor's diagnosis. Parents were skeptical, and Stepfather said that he would continue to play with B.J. in the same manner. He and Grandmother began to argue, and Stepfather told Mother to get the kids so that they could leave. However, Grandmother locked herself in a room with B.J. and refused to come out. The Parents left with P.J., but B.J. remained with Grandparents.

The day after the argument, on or about September 4, 2011, Parents were supposed to pick up B.J. from Grandparents' house. When Mother arrived at the house, Grandparents were not there. Mother was concerned because Grandparents had changed the garage door access code and the blinds to their house were down, which Mother found to be unusual. When Mother called Grandparents, she did not receive a response. Mother called Stepfather, and he suggested that she give Grandparents more time to respond. After waiting two hours, Parents called the police. The police located Grandparents at their property in Owen County and asked that they return to Johnson County with B.J. Grandparents eventually returned B.J. to Parents, and she began living exclusively with them. After taking custody of B.J., Parents took her to an emergency room for examination

---

[1] The juvenile court's order notes that the chiropractor is a "long time [sic] family friend." (App. 43). While the record is clear that this chiropractor has treated Grandparents and Mother over a period of twenty years, the extent of any friendship is unclear.

of any injuries from the pillow fight. Doctors at the hospital found no injuries during their examination.

On September 14, 2011, Grandparents filed a verified motion to establish custody in the person of de facto custodians regarding B.J. In their motion, Grandparents alleged that Mother had effectively abandoned B.J., that removing B.J. from their care would "cause severe mental harm and physical risk" to B.J., and that it was in B.J.'s best interest to be placed with Grandparents on a temporary and eventually permanent basis. (App. 58). Grandparents also filed a motion for a bonding assessment. The trial court granted the motion for a bonding assessment and set the matter for a hearing to determine de facto custodian status and temporary custody.[2]

Ehrman & Associates completed the bonding assessment and filed it with the court on October 28, 2011. Dr. John Ehrman ("Dr. Ehrman"), who completed the assessment, concluded that B.J. was very well bonded to Grandparents. Dr. Ehrman also included information in his report essentially questioning the physical and emotional well-being of B.J. However, during his testimony at the final hearing, Dr. Ehrman acknowledged that the only source of his information was Grandmother, and that he had never met the Parents prior to the final hearing.

On November 15, 2011, the juvenile court held the evidentiary hearing to determine de facto custodian status. On the same day, Grandparents also filed a petition for a custody evaluation. After hearing evidence and accepting proposed findings of fact and

---

[2] The case was later transferred to Johnson County's Juvenile Court.

6

conclusions thereon, the juvenile court entered an order adjudicating Grandparents as de facto custodians. However, the court left B.J. in the custody of Parents and ordered that Grandparents would have visitation with B.J. pursuant to the Indiana Parenting Time Guidelines and at all other agreed times. Finally, the court ordered a custody evaluation and required the parties to participate in mediation prior to a contested hearing determining permanent custody.

Mediation failed, and both parties filed a bevy of motions regarding this matter. Parents filed a notice to relocate to Hendricks or Marion County to be closer to B.J.'s school. Grandparents filed motions objecting to the relocation and to Parents enrolling B.J. in a school outside of the area of her residence at that time, claiming that it would constitute a "de facto relocation." (App. 232). Grandparents also filed motions for contempt against Parents for not complying with the Indiana Parenting Time Guidelines. The juvenile court set a hearing regarding the relocation motion, but eventually vacated the hearing because the custody evaluation was not complete.

On or about October 22, 2012, Dr. Joni Gonso ("Dr. Gonso") completed the custody evaluation. Dr. Gonso conducted approximately twenty hours of interviews with Parents, Grandparents, and Stepfather's parents, as well as telephone conferences with B.J.'s principal, teacher, and pediatrician. Dr. Gonso also performed separate observations of B.J. with Parents, P.J., and B.J.'s stepsister,[3] and then with Grandparents. She also

---

[3] Stepfather has a daughter from a previous relationship.

reviewed materials provided by Parents and Grandparents. Finally, Dr. Gonso administered some psychological tests to Parents and Grandparents.

Dr. Gonso prepared a forty-one page report detailing her findings and recommendations. The summary of her interviews and observations were as follows:

> In summary, [Grandparents], especially [Grandmother] as the primary attachment figure, provided [B.J.] security the first two years [of her life]. This allowed [Mother] to finish school, work, live independently[,] and mature. That said, [Mother] was regularly involved in [B.J.'s] life. They developed an attachment relationship, as children can have multiple attachment relationships. Over time, [B.J.] transitioned to spending more time with [Parents]. More importantly, the quality of that attachment, which promoted both a safe haven as well as exploration and the development of competencies, became as important, if not more so, than that of [Grandmother's] attachment relationship with [B.J.].
>
> As the [Parents] pushed for [B.J.] to live with them on a full[-]time basis, the [Grandparents] likely felt threatened by a sense of loss. Subtle indicators of B.J.'s increasing reliance, preference, trust and love for [Parents] heightened their anxiety. It should be noted that the [Grandparents] were at a transition point in their lives, or what would commonly be called empty nesters. Couples either hold on to past patterns or re-evaluate their lives and plan for the future. [Grandmother] had a sense of entitlement vis-à-vis [B.J.]; i.e., look at all I've done, therefore I deserve [custody]. Additionally, her boundaries blurred. There is evidence of confusion when at times she referred to [B.J.] as "my baby." The [Grandparents] reacted by engaging in a parenting competition with the [Parents]. In order to promote themselves, they criticized and denigrated the [Parents]. The [Grandparents'] "evidence" was based on misperceptions, fears, making mountains out of mole hills, jumping to conclusions, etc. In her log, [Grandmother] interpreted the pillow fight as abuse and was convinced [B.J.] sustained whiplash. She questioned returning [B.J.] to the [Parents]. In an email, [Grandmother's sister] wrote that [Grandparents] "felt it wasn't safe for [B.J.] to go (back to the [Parents])." It is not a stretch to hypothesize that the [Grandparents] withheld [B.J.] from the [Parents] on September 3, 2011 with the intent of filing a petition against them.
>
> * * * *
>
> During the pendency of the legalities, the [Grandparents], continued to campaign against the [Parents]. Consciously or unconsciously, [B.J.] was incorporated into their process. She endured questioning, insinuations that

8

the [Parents] were bad parents, pressure to choose the Grandparents over [P]arents; hygiene rituals pertaining to her hair, vagina, fingernails and toenails so [Grandmother] could prove her superior parenting; emotional manipulations by the [Grandparents] at the time of transitions/exchanges; examinations by three professionals (chiropractor, ER doctor and pediatrician) because of the whiplash/abuse allegations; etc. Whatever concerns the [Grandparents] had about the [Parents'] parenting, stability, or psychological adjustment, [Grandparents'] behavior has been much more destructive and bordered on emotional abuse of [B.J.]. Their focus has been on their own fears, needs[,] and self-serving interests rather than the best interests of [B.J.]. Asked about the emotional impact of [B.J.] being removed from the primary care of the [Parents] after a year and [being] placed full time with [Grandparents], [Grandparents] responded, "Well, they took her away from us." They had no response to the question of how their petition to set aside the adoption would affect [B.J.]; i.e., how could it be explained to [B.J.] that her daddy was no longer her daddy?

(Parents' Ex. B at 42). Dr. Gonso recommended that the Parents receive sole legal and

physical custody of B.J. Specifically, her report stated the following:

There are no concerns about [Parents'] stability, parenting or emotional adjustment. They, especially [Mother], are attuned to their daughter's physical, emotional, and social needs. They make decisions prioritizing her best interests. [B.J.] is comfortable and preferenced [sic] living with her parents. She has bonded to her sisters, P.J. and [stepsister]. She has thrived and developed, especially in the areas of independence, self-help skills and socialization under her parents' primary care.

[B.J.] loves her Grandparents and they remain important attachment figures in her life. However, their relationship with her is compromised currently by their fear, anger, and selfishness. It is a burden on [B.J.] to have to meet their emotional agenda. It is not recommended that they be awarded formal visitation with [B.J.]. Instead, the [Parents] can be trusted to determine how B.J.'s relationship with the [Grandparents] should proceed. The best interest of [B.J.] and the family system as a whole would be for the [Grandparents] to accept their role as Grandparents and be supportive of the [Parents]. This is the appropriate path to "become a family again."

(Parents' Ex. B at 43). The juvenile court held a status hearing on October 22, 2012 and

set the matter for a final hearing on December 10 and 11, 2012. In addition to presenting

9

evidence about Mother's alleged abandonment, Grandparents also raised concerns about Stepfather's mental health.

Stepfather enlisted in the United States Army after graduating from high school in 2004 and was deployed to Iraq in 2007. He was an infantryman and was involved in numerous firefights, including being hit by two improvised explosive devices in one day. As previously mentioned, Stepfather met Mother during this time and developed a relationship. He pursued a discharge from the Army when he returned to Indiana in 2008.

Stepfather had a hard time adjusting to an unstructured civilian life and experienced nightmares, anxiety, hyper vigilance, insomnia, and recurring traumatic flashbacks. He turned to heavy alcohol consumption to cope. His use of alcohol led to an incident in February 2010 between himself and another man at his apartment.

People were gathered at Parents' apartment drinking. Stepfather believed that another man was making advances at Mother. Stepfather was intoxicated, became upset, and went to his bedroom to retrieve an AK-47 rifle. He returned to the room where the man was and pointed the rifle at him, though the gun was unloaded. Stepfather's friends tackled him and wrestled the rifle away. Realizing that he needed professional help, Stepfather told his friends that he wanted to go to the hospital. They took him to Veteran's Hospital in Indianapolis that evening.

Stepfather was diagnosed with post-traumatic stress disorder ("PTSD"). He did not seek psychotherapy for his PTSD. Instead, Stepfather limited his alcohol consumption and leaned on Mother and his friends for support when he experienced PTSD symptoms.

10

Stepfather also began working as a union ironworker—thanks in part to Step-Grandfather—and credited his job as further helping his adjustment.

As a part of the proceedings, Dr. Bartholomew Ferraro ("Dr. Ferraro") performed a psychological evaluation of Stepfather. Dr. Ferraro met with him for two and one half hours and administered a full battery of psychological tests. Dr. Ferraro issued a report on January 17, 2013 concluding the following:

> [W]hile symptoms continued to be present in the initial months following his discharge [from the hospital], six months later, (September, 2010) most symptoms were notably in remission if not absent from his experience. In the years that followed [the cause of his PTSD], [Stepfather] married, conceived a daughter, and adopted a daughter. He significantly reduced the quality and quantity of his alcohol consumption, invested in a career, and engaged with greater purpose both in this pursuit as well as in meaningful relationships with others. These efforts clearly helped him regain behavioral control and emotional stability. It is noted that at the [present] time (1/17/2013), [Stepfather's] report of his current experience fails to identify the presence of even a single criterion symptom needed to render the diagnosis of PTSD.

(Parents' Ex. F at 12).

On September 19, 2013, the juvenile court issued an order containing over one hundred findings of fact and concluded that Grandparents did not rebut the presumption that it is in the child's best interest to be placed in the custody of the natural parent. The juvenile court granted sole legal and physical custody of B.J. to Parents and ended the court-ordered visitation granted to Grandparents. All remaining petitions were decided in favor of Parents. Grandparents now appeal the juvenile court's custody order and its order regarding visitation. We will provide additional facts as necessary.

DECISION

Our Supreme Court set forth the standard of review regarding custody disputes between a natural parent and a third party:

> before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because a third party could provide the better things in life for the child. . . . [E]vidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interest, however, will not be adequate to support such determination, and detailed and specific findings are required.

*In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002) (internal citations and some quotation marks omitted).

A party challenging a trial court's findings in this regard will not succeed unless the order is clearly erroneous "and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52. A judgment is clearly erroneous when it relies on an incorrect legal standard. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 972 (Ind. 1998). "We disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Yoon v. Yoon*, 711 N.E.2d 1265,

12

1268 (Ind. 1999). We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

In this appeal, Grandparents claim that the juvenile court erred by placing B.J. in Parents' custody and ending their court-ordered parenting time with B.J. Specifically, Grandparents argue that: (1) many of the juvenile court's factual findings are not supported by the evidence; (2) the juvenile court applied the improper legal standard in determining B.J.'s placement; and (3) we should expand the de facto custodian statute to give third parties the right to seek visitation with a child that has been in their care. We address each of their arguments in turn.

1. Factual Findings

While Grandparents contend that the evidence fails to support many of the juvenile court's factual findings, Grandparents focus their argument on findings regarding Stepfather's mental health and Parents' supposed lack of concern for B.J.'s medical needs.

a) *Stepfather's Mental Health*

The juvenile court found that "[Stepfather] does not pose a risk to himself or persons around him and appears to be steady and stable." (App. 47). Grandparents challenge this finding by attempting to discount the evaluation performed by Dr. Ferraro. For example, Grandparents state, "[Dr. Ferraro] could not conclusively say that symptoms [of PTSD]

would never reoccur in the future." (Grandparents' Br. 33). We view this as an invitation to have this Court reweigh the evidence, which we will not do.[4]

Despite this, it is important to note that Dr. Ferrano testified that, given Stepfather's investment and identity in the roles of a father and a husband and his enjoyment of his career, "it would take more than the usual stress to impact Stepfather in the way that is being suggested," and "testing suggests that he is quite resilient in his capacity to cope." (Tr. 769). Thus, evidence in the record supports the juvenile court's finding regarding Stepfather's mental health.

b) *Lack of Medical Attention*

Regarding B.J's health, the juvenile court found that, "The [Grandparents], particularly [Grandmother], are unduly obsessive about [B.J.'s] health and hygiene and believe the [Parents] are neglectful or deficient in their attention to these issues. (App. 47). Grandparents claim that the juvenile court "failed to give due deference to the fact that the child has had a reoccurring [sic] infection . . . while primarily in the care of [Parents], and for which a doctor diagnosed the medical problem." (Grandparents' Br. 33). Grandparents go on to claim that the juvenile court, "[undermined] and [dismissed] legitimate claims of potential, and actual, harm B.J. is suffering in the care of [Parents]." (Grandparents' Br.

---

[4] Grandparents, while discussing Stepfather's mental health, make reference to the fact that Stepfather keeps firearms in a dangerous manner and claims that the juvenile court ignored this evidence. The only evidence of this was Grandmother's testimony. Stepfather denied keeping firearms in a dangerous manner. Furthermore, the record shows that Stepfather's firearms are kept in a gun safe away from the children. We see this as another invitation from Grandparents to reweigh the evidence. Again, we decline their invitation to do so.

14

33). This is yet another invitation from Grandparents to reweigh the evidence, and again, we decline their invitation.

The record supports the juvenile court's finding. For example, regarding B.J.'s pillow fight with Stepfather, Grandmother insisted that B.J. suffered from whiplash. Her insistence continued even though B.J. laughed and did not cry during the incident, and never complained of pain at time of the incident nor at her appointment with the chiropractor. While Grandmother's chiropractor testified that B.J. suffered from whiplash, Parents presented evidence that an emergency room physician found no injuries. Accordingly, the juvenile court did not err in its finding regarding B.J.'s health.

2. Improper Legal Standard

The juvenile court concluded the following: "[h]aving failed to overcome by clear and convincing evidence the presumption that [B.J.'s] best interest is served by placement with her natural parent, it is hereby ordered that Respondents, [Parents], shall have and maintain sole legal and physical custody of [B.J.]. (App. 54). Grandparents argue that the juvenile court applied an incorrect legal standard to reach its conclusion that Parents should have custody of B.J. Specifically, Grandparents claim that the juvenile court "did not properly analyze the facts and circumstances in light of the caselaw [sic] and statute, namely the [factors stated in *Hendrickson v. Binkley*, 316 N.E.2d 376 (Ind. Ct. App. 1974)] and Indiana Code § 31-14-13-2.5." (Grandparents' Br. 31). We disagree.

*Hendrickson* established the following test to resolve custody disputes between natural parents and third parties:

15

First, it is presumed it will be in the best interest of the child to be placed in the custody of the natural parent. Secondly to rebut this presumption, it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child.

*Hendrickson*, 316 N.E.2d at 380. However, as previously mentioned, our Supreme Court held in *B.H.* that the *Hendrickson* test is helpful, but a court is not limited to this evidence and further explained that what is determinative is whether the third party has rebutted the presumption in favor of the natural parent by clear and convincing evidence *B.H.* 770 N.E.2d at 287.[5] Therefore, the juvenile court could not err by failing to analyze the facts before it under the *Hendrickson* test, because it was not required to use the test at all. *See, e.g.*, *Parks v. Grube*, 934 N.E.2d 111, 115 (Ind. Ct. App. 2010) (third party was not required to prove *Hendrickson* factors to carry its burden).

Further, Grandparents appear to argue that the de facto custodian statute plays a role in determining whether a third party has overcome the presumption in favor of the natural parent in custody disputes. Indiana Code § 31-14-13-2.5 lists factors a court should consider in determining custody when a de facto custodian is involved. However, these circumstances are considered in conjunction with a general determination of a child's best interest. When a third party seeks custody of a child, a general best interest analysis does not begin until the third party has rebutted the presumption in favor of the natural parent. *Francies v. Francies*, 759 N.E.2d 1106, 1114 (Ind. Ct. App. 2001), *trans. denied*. The juvenile court correctly omitted the factors listed in Indiana Code § 31-14-13-2.5 from its

---

[5] The Court reaffirmed this position in *In re Paternity of K.I.*, 903 N.E.2d 453, 459 (Ind. 2009), where it observed that trial courts may rely on *Hendrickson* for guidance.

16

order because it deemed that Grandparents had failed to overcome the presumption in favor of Mother as the natural parent. The juvenile court used the correct legal standard, and arrived at a conclusion that is supported by the evidence.

Grandparents argue that their self-serving allegations of acquiescence and the existence of a strong emotional bond are sufficient evidence to reverse the juvenile court's judgment. However, Grandparents do not point to any other evidence demonstrating that they carried their burden of showing that placement with them, rather than Parents, represented a substantial and significant advantage to B.J. Indeed, the essence of their argument is summed up by the following exchange during the final hearing:

> Daniel Layden: Okay, so is it fair to say, sir, that you really just think that your wife would do a better job than this child's parents are doing?
>
> [Step-Grandfather]: I believe she may very well be in harm's way.
>
> Daniel Layden: Harms way? How so?
>
> [Step-Grandfather]: Anger, aggressive nature, firearms. Well not firearms in general just the inability to take care of them. She is . . .
>
> Daniel Layden: But do you have any evidence, whatsoever, sir, that either of these two people have abused that child?
>
> [Step-Grandfather]: I do not.
>
> Daniel Layden: So why would you say that?
>
> [Step-Grandfather]: I'm not accusing them of abuse.
>
> Daniel Layden: So really again, sir, isn't it that you believe you and your wife would do a better job than this child's parents are doing? Raising this child?
>
> [Step-Grandfather]: I do believe. Yes.

(Tr.637-38). As such, the juvenile court did not err in concluding that Grandparents failed to overcome the presumption in favor of granting custody of B.J. to Parents. *See, e.g.*, *K.I.*, 903 N.E.2d at 459.

3. Visitation Rights

Finally, Grandparents essentially ask that we expand the de facto custodian statute to give third parties visitation rights with children after being removed from their care. We decline to do so because our Supreme Court has clearly spoken on this issue in *K.I.*

In *K.I.*, this Court remanded a custody order for the trial court to determine whether a grandparent would have visitation under the Grandparent Visitation Act or the de facto custodian statute. On transfer, the Supreme Court found that the de facto custodian statute provided no relief for a third party seeking visitation, specifically observing the following:

> [De facto custodian status] bears only on the question of custody. The apparent intent of the de facto custodian statute is to clarify that a third party may have standing in certain custody proceedings, and that it may be in a child's best interests to be placed in that party's custody. The statute is silent on the question of visitation.

*Id.* at 461-62. (internal citations omitted). We are bound by our Supreme Court's decisions, and its precedent is binding on us until it is changed by our Supreme Court or legislative enactment. *Continental Ins. Co. v. Wheelabrator Technologies, Inc.*, 960 N.E.2d 157 (Ind. Ct. App. 2011), *reh'g. denied, trans. denied*. Accordingly, we decline Grandparents' request to expand the de facto custodian statute to include visitation rights.

We affirm the decision of the juvenile court granting legal and physical custody of B.J. to Parents and denying continued court-ordered visitation rights to Grandparents.

Affirmed.

NAJAM, J., and BAILEY, J., concur.