## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 02 2015, 8:53 am

CLERK
of the supreme court,
court of appeals and
tax court

| APPELLANT PRO SE | ATTORNEY FOR APPELLEE |
| --- | --- |
| Alicia Emanuele | Thomas M. Barr |
| Nineveh, Indiana | Nashville, Indiana |

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| Amanda and Joseph Emanuele and Alicia Emanuele, *Appellants-Petitioners,* v. Winford E. Moore, III, *Appellee-Respondent.* | June 2, 2015 Court of Appeals Case No. 41A01-1409-GU-397 Appeal from the Johnson Superior Court. The Honorable Kevin M. Barton, Judge. Cause No. 41D01-1404-GU-49 & 41D01-1405-JP-92 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Petitioners, Joseph A. Emanuele and Amanda K. Emanuele (Grandparents), and Appellant-Respondent, Alicia R. Emanuele (Mother), appeal the trial court's Order denying Grandparents' petition for permanent guardianship of Mother's minor child, Ava M. Emanuele-Moore (Child), and awarding custody of the Child to her biological father, Appellee-Petitioner/Respondent, Winford E. Moore, III (Father).

We affirm.

## ISSUES

Grandparents and Mother raise four issues on appeal, which we consolidate and restate as the following three issues:

(1) Whether the trial court erred in denying Grandparents' petition for guardianship;

(2) Whether the trial court implied an improper standard in light of Grandparents' status as the Child's de facto custodians; and

(3) Whether the trial court abused its discretion by proceeding without the recommendation of a court appointed special advocate (CASA).

## FACTS AND PROCEDURAL HISTORY

In the latter part of 2009, high school students—Father and Mother—began dating, and Mother soon became pregnant. On March 13, 2010, the Child was born two months premature. Father was present for the Child's birth, and two days later, he executed a paternity affidavit claiming to be the Child's biological

father.  Because no court order for custody was ever entered, pursuant to Indiana Code section 31-14-13-1, Mother has had sole legal custody.

[5]   Due to the Child's premature birth, she could not be taken home from the hospital until she was approximately one and one-half months old.  During her hospitalization in Indianapolis, Indiana, both Father and Mother stayed by the Child's side.  When the Child was released, Father and Mother attempted to live together as a family in Grandparents' home in Nineveh, Johnson County, Indiana.  Father was very active in the Child's care—feeding, bathing, and changing her.  When Father and Mother ended their relationship, Father moved back to his house in Morgantown, Brown County, Indiana, and per an informal agreement, the Child spent every other weekend with him.  Since birth, the Child has primarily lived with Mother in Grandparents' house, and Grandparents have provided a significant amount of care and support for the Child.  However, at various intervals during the first four years of the Child's life, Father and Mother reconciled their relationship, during which times Mother and the Child lived in Father's house.  Regardless of the relationship status of Father and Mother at any given point, it is undisputed that Father maintained an active involvement in the Child's life.  Although Father has never paid any formal child support to Mother or Grandparents, he consistently paid for one-half of the Child's daycare expenses and purchased clothing and other items for the Child.

[6]   Shortly after the Child was born, Mother developed a substance abuse problem.  Once when the Child was eight months old, Father discovered Mother and

three men sitting in a parked vehicle, crushing and snorting Mother's prescription pain medicine and smoking cigarettes, apparently undeterred by the fact that the Child was also in the vehicle. Father removed the Child from her car seat and took her home with him. In April of 2013, Father and Mother reconciled, so Mother and the Child moved into his house. However, Father soon suspected that Mother was doing methamphetamine, and she was spending time with other people who were known in the community to be "meth addicts." (Tr. p. 143). By May of 2013, Father found evidence that Mother was using drugs in his house, so he asked her to move out.

[7] Thereafter, Father realized that Mother was taking the Child with her into known "drug houses" and getting high in the Child's presence. (Tr. p. 150). On one occasion in particular, Father drove by one of these drug houses and observed Mother's vehicle in the driveway. Knowing that the Child was supposed to be with her, Father approached the house and, through the windows, saw the Child playing on the floor while Mother and a man were lying on the couch, undressed and "obviously covered in track marks." (Tr. p. 149). Father pounded on the door until the Child let him in. Mother tried to stop Father from taking the Child, but Father refused to leave without her. Father contacted law enforcement to discuss his options for keeping the Child away from Mother but was informed that he needed to return the Child to Mother as the custodial parent.

[8] Mother's methamphetamine use resulted in her being hospitalized in July of 2013, November of 2013, and again in March of 2014. Each time, she assured

the hospital staff that she would seek substance abuse treatment upon her release, but she never did. In fact, she acknowledged to Father that she continued to inject speed balls—*i.e.*, a mix of heroin and methamphetamine—into her veins. Father had numerous discussions with Grandparents regarding Mother's drug use and his concerns about the Child's exposure to her lifestyle. He asked them to stop allowing Mother to drive their vehicle and to prevent her from taking the Child with her to friends' houses. When Father's pleas went unanswered, he explained to Grandparents that he "was over it" and planned to file for emergency custody. (Tr. p. 150). Grandparents asked Father not to file anything; instead, on April 24, 2014, they filed an emergency petition for temporary custody of the Child.

[9] On May 1, 2014, the trial court conducted a hearing on Grandparents' emergency petition, during which Father objected and asserted his desire to have custody of the Child. The trial court determined that it would maintain the status quo by appointing Grandparents as the Child's temporary guardians for a period of ninety days, during which time the trial court expected Father to demonstrate his ability to be the custodial parent. On May 5, 2014, the trial court issued an order, officially appointing Grandparents as the Child's temporary co-guardians. The trial court also ordered that, during the temporary guardianship, Father should exercise parenting time in accordance with the Indiana Parenting Time Guidelines and provide for the Child's care and support. The trial court also stipulated that Mother was not allowed to remove

the Child from Grandparents' house and could only see the Child if supervised by Grandparents.

[10] During the ninety-day guardianship, Mother went to a rehabilitation facility for approximately one week. Although Grandparents believed that Mother "remained clean" following her brief treatment, Grandparents kicked her out of their house because she was not pursuing employment or assisting with household responsibilities. (Tr. p. 71). Mother subsequently moved in with her boyfriend. Notwithstanding the trial court's mandate that Grandparents supervise all of Mother's interactions with the Child, Grandparents allowed Mother to pick the Child up from daycare on several occasions and to take her to the Johnson County Fair and on other outings without their supervision.

[11] On May 14, 2014, Father filed a verified petition to establish custody, parenting time, and child support. On May 30, 2014, Grandparents' guardianship action was consolidated with Father's paternity case. On August 5, 2014, the trial court conducted a hearing on the issues of permanent guardianship, paternity, custody, support, and parenting time. On August 20, 2014, the trial court issued its Order, denying Grandparents' petition for guardianship and awarding custody to Father. The trial court ordered that Mother was entitled to one two-hour visit with the Child per week, to be supervised by Father, until she could demonstrate that she had not used drugs for a period of six months.

[12] Grandparents and Mother now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[13] In this case, the trial court entered special findings of fact and conclusions thereon, so our review is guided by Indiana Trial Rule 52(A). Trial Rule 52(A) requires a two-tiered analysis: first, we must determine whether the evidence supports the findings; and second, we decide whether the findings support the judgment. *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009). Our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). If there is no evidence to support the findings or the findings do not support the judgment, or if the trial court applied the wrong legal standard to properly found facts, we will find clear error. *K.I. ex rel. J.I.*, 903 N.E.2d at 457.

[14] In addition, determinations of child custody "fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion." *In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002), *reh'g denied*. Reversal is only appropriate if the trial court's decision is contrary to "the logic and effect of the facts and circumstances before the [c]ourt or the reasonable inferences drawn therefrom." *Id.* "In deference to the trial court's proximity to the issues," we do not reweigh evidence and will consider only the evidence most favorable to the judgment. *Id.* at 287-88.

## II. *Guardianship/Custody*

[15] Grandparents claim that the trial court erroneously denied their petition for permanent guardianship. Indiana's guardianship statute provides that "[a]ny person may file a petition for the appointment of a person to serve as guardian for . . . [a] minor." Ind. Code § 29-3-5-1(a). To succeed on a guardianship petition, the trial court must find that "the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the . . . minor." I.C. § 29-3-5-3(a)(2). Here, Grandparents asserted that a guardianship was warranted because neither Father nor Mother were capable of providing the Child with a stable home. However, Father objected to the guardianship and requested custody of the Child. Accordingly, the guardianship proceeding essentially amounted to a child custody dispute between a natural parent and a third party. *See In re Guardianship of L.L.*, 745 N.E.2d 222, 227 (Ind. Ct. App. 2001), *trans. denied*.

[16] Our supreme court has recognized that there is a well-established presumption that a "child's best interests are ordinarily served by placement in the custody of the natural parent." *In re Guardianship of B.H.*, 770 N.E.2d at 287. Thus, "before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement." *Id.* A third party may not overcome the presumption favoring the natural parent simply by establishing that he or she could provide "better things in life for the child." *Id.* Rather, the trial court must make "detailed and specific findings" demonstrating "that

placement with a person other than the natural parent represents a substantial and significant advantage to the child." *Id.* In making this determination, the trial court has sound discretion and may consider "evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person," among innumerable additional criteria. *Id.*

[17]   In the present case, the trial court concluded that Grandparents did not establish "by clear and convincing evidence a basis for custody in derogation of the parental right of custody." (Appellants' App. p. 32). In support of this determination, the trial court found, in relevant part:

> 12. Father lives in a farm house in Brown County that is owned by his mother. Father lives by himself. He is employed by his step-father for Indiana Seamless Gutters at Twelve Dollars ($12.00) per hour. Father testified that he could financially support [the Child]. Father receives financial assistance from his mother and step-father if necessary.
>
> 13. The [c]ourt does note that the pending guardianship was precipitated as a result of Father's efforts in being proactive in protecting [the Child]. Father's effort to obtain [the Child] after he found [Mother] at a "friend's" house with [the Child] prompted [Grandparents] to seek formal guardianship over [the Child].
>
> 14. No evidence was presented that was adverse to Father's parenting ability or to his ability to provide for the care of [the Child]. In fact, [Mother] described Father as being a good father. Evidence was presented that Father loves [the Child], provides for her care, [the Child] loves him and the two of them have a good relationship.
>
> * * * *
> 17. [Grandparents] have not proven any misconduct of Father. Father has not abandoned [the Child]. In fact, he has sought to be part

> of [the Child's] life.  Father has not acquiesced in [the Child's] custody
> by another.  Father deferred to Mother's statutory right of custody
> until he determined that [the Child] was being endangered by Mother's
> actions.  He has not acquiesced in the custody of [the Child] being
> with [Grandparents] in derogation of his own right as father."

(Appellants' App. pp. 31-32).

Relying on outdated case law, Grandparents contend that "by the showing of at least one of the above factors [*i.e.*, parental unfitness, acquiescence, or voluntary relinquishment], it would be in the best interests of the child to be placed with the third party." (Appellants' Br. p. 10) (citing four cases which have all been abrogated by *In re Guardianship of B.H.*, 770 N.E.2d at 283).  To this end, they assert that they have sufficiently rebutted the parental presumption because—contrary to the trial court's finding—Father "in fact has acquiesced his rights to custody of [the Child]." (Appellants' Br. p. 11).  According to Grandparents, Father's "lack of financial support and alleged knowledge and witness of a continued use of drugs by [Mother]," are "not reflective of a parent who is interested in providing care and support for [his] child." (Appellants' Br. p. 11).  We find no merit in this claim.

We first note that Grandparents' argument is merely a request to reweigh the evidence, which we decline to do.  It was well within the discretion of the trial court to consider *any number* of factors in evaluating whether Grandparents had overcome "the important and strong" parental presumption, and the trial court clearly found that the evidence of Father's lack of formal child support and his awareness of Mother's substance abuse did not satisfy this burden.  *In re Guardianship of B.H.*, 770 N.E.2d at 287.  Furthermore, we find ample support

in the record for the trial court's determination. Father has been an active part of the Child's life since her birth—"vigorously and appropriately pursu[ing] what is his right, to be a father to his [Child]." *In re I.E.*, 997 N.E.2d 358, 364 (Ind. Ct. App. 2013), *reh'g denied, trans. denied*. During the intervals that Father and Child lived in the same house, Father acted as a primary caregiver, and when the Child was living with Grandparents, Father regularly exercised parenting time. Father—with the help of his family—contributed to the costs of daycare and provided clothing and other items for the Child's care.

[20] Additionally, Father has suitable housing, is gainfully employed, and is "willing and able to provide for [the Child]." *Id.* Father testified that the Child has her own bedroom and playroom in his home, and that there is "tons of stuff" for the Child to do on his forty-five-acre farm. (Tr. p. 133). The parties agree that Father and the Child have a close relationship, and Father explained that the Child is "really smart for a four (4) year old," and they enjoy fishing and exploring in the woods together. (Tr. p. 156). Father maintains a schedule for the Child and enforces rules for her behavior. At the time of the hearing, Father had already arranged for the Child's enrollment in a preschool program. In light of this evidence, we cannot say that the trial court clearly erred in concluding that Grandparents "failed to present evidence that clearly and convincingly established that [the Child's] best interests would be substantially and significantly served by continued placement with [Grandparents], such as to overcome the 'strong presumption' that custody of [the Child] should be

given to [her] natural father." *In re I.E.*, 997 N.E.2d at 364 (quoting *K.I. ex rel. J.I.*, 903 N.E.2d at 460).

### III.  *De Facto Custodians*

Grandparents also claim that the trial court erred by failing to take into account the fact that they were the Child's de facto custodians in determining whether they had overcome the natural parent presumption.  Grandparents posit that because they "have been de facto custodians for the last four years, the trial court had a responsibility to view [them] on the same level as the natural parent(s) in determining custody." (Appellants' Reply Br. p. 5).  We find that Grandparents' argument runs afoul of both longstanding precedent and the constitutional protection afforded to *parents* in matters "concerning the care, custody, and control of their children." *In re Paternity of L.J.S.*, 923 N.E.2d 458, 461-62 & n.1 (Ind. Ct. App. 2010), *trans. denied*.

"A person is a 'de facto custodian' if he has been the primary caregiver for, and financial support of, a child who has resided with the person for a period of at least one year if the child is at least three years old." *In re Paternity of T.P.*, 920 N.E.2d 726, 730-31 (Ind. Ct. App. 2010), *trans. denied*.  A "third party must demonstrate de facto custodian status by clear and convincing evidence." *A.J.L. v. D.A.L.*, 912 N.E.2d 866, 870 (Ind. Ct. App. 2009).  Father notes that the trial court did not specifically find that Grandparents were the Child's de facto custodians, which Grandparents now challenge.  However, we need not address this argument.  Even assuming that Grandparents were de facto custodians, they were absolutely not "on a level playing field" with Father.  *In*

*re I.E.*, 997 N.E.2d at 362. Rather, they were still obligated to "overcome the strong presumption in favor of Father, the natural parent, in order to gain custody of [the Child]." *In re Paternity of L.J.S.*, 923 N.E.2d at 461 n.1.

[23] Moreover, *if* a third party rebuts the natural parent presumption—that is, *if* it is not axiomatic that it is in the best interests of the child for the natural parent to have custody—only then does "the court engage[] in a general 'best interests' analysis" to determine whether to award custody to the natural parent or the third party/de facto custodian. *In re Guardianship of L.L.*, 745 N.E.2d at 231. Thus, the statutory best interests factors and the de facto custodian criteria, if applicable, are only relevant to the trial court's determination of custody *after* "the third party has rebutted the presumption in favor of the natural parent." *T.H. v. R.J.*, 23 N.E.3d 776, 786 (Ind. Ct. App. 2014), *trans. denied*. *See* I.C. §§ 31-14-13-2; -2.5 (enumerating the best interests and de facto custodian factors to consider in making an award of custody in a paternity action). Here, the trial court applied the correct standard and concluded that Grandparents did not meet their burden of overcoming the natural parent presumption. As a result, the Child's best interests were presumed, so there was no reason for the trial court to conduct a general best interests analysis, and Grandparents' status as de facto custodians is irrelevant. *See In re Paternity of T.P.*, 920 N.E.2d at 731.

### IV. *Appointment of a CASA*

[24] Lastly, Grandparents claim that the trial court abused its discretion by failing to utilize a CASA in determining the Child's best interests. During the May 1, 2014 hearing on temporary guardianship, the trial court indicated that it

intended to appoint a CASA, "if they have someone who's available[,]" in order to "spend a little bit of time with the situation." (Tr. pp. 28-29). Prior to the start of the hearing on August 5, 2014, the trial court realized that although the CASA received its order, no action was taken in response thereto. The trial court elected to proceed without further delay and stated that if it "need[ed] anything further[,] it would contact the CASA." (Tr. p. 51).

[25] Grandparents now assert that the appointment of the CASA

> was the preferred and expected process so that the [c]ourt would be able to make a fully informed determination about custody. Without such information, even during questioning of [c]ounsel, we believe the [t]rial [c]ourt was significantly limited as to the factual truths of testimony given, verification of the ability to take permanent care of a minor child, suitable living conditions, etc.

(Appellants' Br. p. 14). We disagree. Grandparents do not cite any statute or other authority that requires a trial court to appoint a CASA before rendering a custody decision. Indiana Code section 31-14-10-1 provides that, in a paternity action, "the court *may* order a probation officer to prepare a report to assist the court in determining" issues of child support, custody, and parenting time. (Emphasis added). The wording clearly indicates that the appointment of an officer to assist the court in a custody determination is discretionary.

[26] Furthermore, we are unpersuaded by Grandparents' contention that "questions asked by [Father's] [c]ounsel would certainly be in favor of his client and not 'unbiased' as to the true ability of [Father] to meet the court's standard to qualify for custody." (Appellants' Reply Br. p. 6). It was up to Grandparents to present evidence and elicit the necessary information during cross-examination

that would enable the court to find in their favor. It is well established that "in child custody cases, trial courts are in the position to see the parties, observe their conduct and demeanor, and hear their testimony." *A.C. v. N.J.*, 1 N.E.3d 685, 688 (Ind. Ct. App. 2013). Thus, the trial court was well-equipped to weigh the evidence, assess the credibility of the witnesses, and make a proper custody determination without consulting a CASA, and we find no abuse of discretion.[1]

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not clearly err in denying Grandparents' petition for guardianship, and it applied the proper standard in awarding custody of the Child to Father. We further conclude that the trial court did not abuse its discretion by proceeding without the assistance of a CASA.

Affirmed.

---

[1] We find that Mother has waived her claims regarding the trial court's decision that she may exercise only two hours of supervised parenting time and that the trial court failed to consider her wish that Grandparents receive custody. Mother has not developed a cogent argument or cited to authority on these issues. *See* Ind. Appellate Rule 46(A)(8)(a). Also, neither the Appellants' Brief nor the Appendix include the trial court's findings or order regarding child support (Father points out that Grandparents and Mother have omitted the last page of the trial court's Order, which included the child support worksheet and findings, from the record.). *See* App. R. 50(A)(2)(b),(h) (requiring the appendix to include a copy of the appealed order and "any record material relied on in the brief"). Moreover, the factual bases upon which Mother relies regarding child support are entirely extraneous to the record, and we consider only the evidence that was submitted to the trial court. Therefore, we find that Mother's claim that the trial court imposed an excessive child support order is also waived. As a final note, we would remind Grandparents and Mother that compliance with the Appellate Rules is necessary to promote our court's efficient review. Thus, all factual assertions should have included a citation to the record; only facts most favorable to the trial court's judgment should have been relied upon; and unpublished memorandum decisions should not have been cited to as precedent. *See* App. R. 22(C); App. R. 46(A)(6)(b); App. R. 65(D).

Bailey, J. and Barnes, J. concur